STATE OF NORTH CAROLINA v. JAMES NATHANIEL WESTBROOK, JR.

No. 94

(Filed 10 June 1971)

1. Constitutional Law § 30; Criminal Law § 135; Homicide § 31— punishment for first degree murder — absolute discretion of jury

No constitutional right of defendant was violated by the provision of G.S. 14-17 giving the jury the absolute discretion, if it found defendant guilty of first degree murder, to determine whether the punishment should be death or imprisonment for life.

State v. Westbrook

2. **Constitutional Law § 30; Criminal Law § 135; Homicide § 31— first degree murder — simultaneous verdict as to guilt and punishment**

In a first degree murder prosecution, no constitutional right of defendant was violated by the fact that, under G.S. 14-17, the jury was required to return simultaneously its verdict upon the issue of guilt and its determination of the punishment to be imposed.

3. **Constitutional Law § 36; Criminal Law § 135; Homicide § 31— death penalty — cruel and unusual punishment**

The imposition of the death penalty for murder in the first degree does not constitute cruel and unusual punishment.

4. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— exclusion of jurors who would never return death penalty**

In this prosecution for the capital crime of first degree murder, the trial court properly sustained the State's challenges for cause of 24 prospective jurors who made it clear on *voir dire* examination that, before hearing any of the evidence, each of them had already made up his mind that he would not return a verdict pursuant to which the defendant might lawfully be executed, whatever the evidence might be.

5. **Constitutional Law § 29; Jury § 5— excusing juror for hardship**

In this prosecution for murder in the first degree, the trial court did not err in excusing on the ground of hardship a juror who had been accepted both by the State and by the defendant and had been sworn, but not impaneled, upon being informed by the juror that she was greatly needed at home to care for a son-in-law so afflicted with multiple sclerosis that he could not care for himself, and her husband, who was also under the care of a physician.

6. **Criminal Law § 43; Homicide § 20— photographs of body**

The trial court did not err in the admission of two photographs of the body of a homicide victim, the jury having been instructed that they were to be considered solely for the purpose of illustrating the testimony of the witness.

7. **Criminal Law § 42; Homicide § 15— clothing found on homicide victim's body**

The trial court did not err in the admission of articles of clothing found upon a homicide victim's body and bearing bullet holes and powder burns which tended to show that the pistol was held close to the victim's body when the shots were fired.

8. **Criminal Law §§ 42, 78; Homicide § 15— photographs of body — deceased's clothing — stipulations by defendant**

Articles of clothing found upon a homicide victim's body and photographs of the body were properly admitted in evidence, notwithstanding defendant in open court admitted the identity of the deceased, the location where the body was found, its general condition and the cause of death, since defendant by such admissions cannot deprive the State of the right to place before the jury all the cir-

State v. Westbrook

cumstances of a homicide in order to show the degree of guilt and to support its request for the death penalty.

**9. Homicide § 15— atrocity of offense — callous disregard of victim — relevancy in capital case**

Evidence bearing upon the atrocity of the offense and the callous disregard exhibited by the defendant toward the victim is especially relevant and material in a prosecution for a capital crime in which the punishment to be imposed is to be fixed by the jury.

**10. Criminal Law § 73; Homicide § 15— testimony as to why witness and defendant went to certain house — competency**

In this homicide prosecution, the trial court did not err in permitting a State's witness to testify as to why he and the defendant went twice to a certain residence on the day the crime was committed and that defendant knew the lady who lived there, since it appears from the testimony of the witness that he and defendant had been acting in concert throughout that day.

**11. Criminal Law §§ 89, 95— in-custody statements by accomplice — corroboration of accomplice's testimony**

Where a State's witness, an alleged accomplice of defendant, testified as to the circumstances of a homicide and that he had given officers a signed statement relating thereto, which statement he supplemented with another fifteen or twenty minutes later, the trial court did not err in permitting the witness to read the supplementary statement to the jury after instructing the jury that it was not substantive evidence but was to be considered with reference to the weight and credit to be given the witness' testimony if the jury found the statement corroborated his testimony.

**12. Criminal Law §§ 89, 95— in-custody statements by accomplice — corroboration of accomplice's testimony**

Where defendant's accomplice was cross-examined with reference to the first signed statement he had given to police officers after he had read to the jury a supplementary statement which he had given the officers, and the first statement tended to corroborate portions of the accomplice's testimony, the trial court did not err in admitting the first statement into evidence after instructing the jury that it should be considered only for corroborative purposes.

**13. Criminal Law §§ 89, 95— in-custody statements of accomplice — testimony by police officer — corroboration of accomplice**

In this homicide prosecution, testimony by a police officer concerning statements made to him by defendant's accomplice and the route which the accomplice showed the officer that he and the defendant had taken was properly admitted for the purpose of corroborating the accomplice's testimony, notwithstanding there was some variation between the officer's testimony and that given by the accomplice.

State v. Westbrook

14. Criminal Law §§ 77, 89— in-custody declaration by defendant — cross-examination of accomplice and police officer — corroboration of defendant

　　Where defendant had not yet testified, the trial court did not err in refusing to allow cross-examination of defendant's accomplice and a police officer as to the contents of defendant's statement to police officers which had been read to the accomplice between the time the accomplice signed his first statement to the investigating officers and the time he signed a supplementary statement, and in refusing to admit defendant's statement into evidence, since at that time defendant's declaration could not be admitted as corroboration of his testimony.

15. Criminal Law § 166— abandonment of assignments of error

　　Assignments of error not brought forward into the brief are deemed abandoned.

16. Criminal Law § 135; Homicide § 31— first degree murder — death penalty — State policy

　　It is the policy of this State, as declared in its Constitution, Art. XI, § 1, and by the General Assembly in G.S. 14-17, that one convicted of murder in the first degree, after a fair trial in accordance with law, shall be put to death if the jury does not, in its discretion, recommend punishment by imprisonment for life.

17. Criminal Law § 102— right of solicitor to seek death penalty— evidence — jury argument

　　It was the right and duty of the prosecuting attorney vigorously, but fairly and in accordance with law, both in the presentation of evidence and in his jury argument, to seek the death penalty in this prosecution for first degree murder. G.S. 15-176.1.

18. Criminal Law § 102— argument of counsel — discretion of court

　　The argument of counsel must be left largely to the control and discretion of the presiding judge.

19. Criminal Law § 102— argument of counsel

　　While counsel must be allowed wide latitude in the argument of hotly contested cases, he may not by argument, insinuating questions, or other means place before the jury incompetent and prejudicial matters not legally admissible in evidence, and may not "travel outside of the record" or inject into his argument facts of his own knowledge or other facts not included in the evidence.

20. Criminal Law § 102— argument of prosecuting attorney — uncomplimentary characterization of defendant

　　When the prosecuting attorney does not go outside of the record and his characterizations of defendant are supported by evidence, the defendant is not entitled to a new trial by reason of being characterized in uncomplimentary terms in the argument.

**21. Criminal Law § 102— argument of prosecuting attorney — epithets — death penalty**

The prosecuting attorney may use appropriate epithets which are warranted by the evidence and may vigorously urge the jury to convict and to impose the death penalty in light of the evidence.

**22. Criminal Law § 102— argument of prosecuting attorney — first degree murder prosecution**

The prosecuting attorney did not depart from the evidence and legitimate inferences to be drawn therefrom in his argument and urging that the jury return a verdict of guilty of murder in the first degree without a recommendation as to punishment.

**23. Criminal Law § 102— homicide prosecution — jury argument — characterization of defendant as robber, thief and gunman**

In this homicide prosecution, the prosecuting attorney's characterization of defendant and his alleged accomplice as "two robbers, two thieves, two gunmen, who practice their trade with a sawed-off shotgun" was supported by defendant's own testimony.

**24. Criminal Law § 102— homicide prosecution — jury argument — characterization of defendant as a "killer"**

It was not improper for the prosecuting attorney to characterize as "killers" a defendant being tried for first degree murder and his companion in the crime.

**25. Criminal Law § 102— jury argument — comment that defendant's testimony was not truthful**

Prosecuting attorney's observation that defendant's testimony, "I don't go for violence," was not "truthful" was proper in view of defendant's criminal record as disclosed by his own testimony.

**26. Criminal Law § 102— homicide prosecution — jury argument — offenses committed by defendant — defendant's treatment of victim and another person**

In this prosecution for first degree murder, prosecuting attorney's catalogue of criminal offenses committed on the day of the victim's death and on previous occasions by defendant and his alleged accomplice, his reminder to the jury of the callous contempt with which defendant and his accomplice had disposed of the victim's body, and his comment concerning the treatment of another person whom defendant and his accomplice had kidnapped earlier the same day of the homicide were supported by the testimony of defendant and his accomplice.

**27. Criminal Law §§ 9, 113; Homicide § 25— instructions — concert of action in robbery — guilt of other crime committed pursuant to the robbery**

In this first degree murder prosecution, the trial court did not err in instructing the jury that if two persons join in a purpose to commit a robbery, each of them, if actually or constructively present, is not only guilty as principal if the other commits that particular

State v. Westbrook

crime, but is also guilty of any other crime committed by the other in pursuance of the common purpose to rob or as a natural or probable consequence thereof.

**28. Criminal Law § 112— instructions on circumstantial evidence**

While circumstantial evidence is sufficient to justify a conviction only when the circumstances proved are consistent with the hypothesis of guilt and inconsistent with every other reasonable hypothesis, no set form of words is required to be used in conveying to the jury this rule relating to the degree of proof required for conviction upon circumstantial evidence.

**29. Criminal Law § 112— instructions on circumstantial evidence**

In this homicide prosecution in which the court charged that concert of action by defendant and his alleged accomplice could be shown by circumstances accompanying the unlawful act and conduct of the defendant subsequent thereto, the court did not err in failing further to instruct the jury that circumstantial evidence is sufficient to justify conviction only when the circumstances proved are inconsistent with the hypothesis that the accused is innocent and with every reasonable hypothesis except·that of guilt, where the court fully charged the jury on the State's burden of proving defendant's guilt beyond a reasonable doubt, and defendant made no request ·for such an instruction.

APPEAL by defendant from *Harry C. Martin, J.,* at the 2 November 1970 Criminal Session of MECKLENBURG.

Upon an indictment, proper in form, charging the defendant with the murder of Carla Jean Underwood, he was tried and convicted of murder in the first degree, the jury making no recommendation that he be sentenced to life imprisonment. From a judgment imposing the sentence by death by asphyxiation, pursuant to the verdict, the defendant appeals.

The evidence for the State included the testimony of the defendant's alleged accomplice, Johnny Frazier, whose counsel was present. Frazier gave a detailed account of the activities of the defendant and himself on the day in question. The evidence for the State was to the following effect:

On 18 June 1970, Carla Jean Underwood, 17 years of age, was employed by Belk's Department Store at the SouthPark Shopping Center in Charlotte, the shopping center being then still under construction. At approximately 12:20 p.m., a fellow worker met her coming out of the store and going toward her automobile in the employees' parking lot. After chatting briefly

with the other employee, Miss Underwood went on to her car alone.

The defendant and Frazier had driven into the parking lot a few minutes earlier. They arrived in a stolen Volkswagen belonging to Mrs. Rose Collins. About an hour before, they had kidnapped Mrs. Collins at gunpoint at another shopping center in the city (Woolco) and had taken her out into the country where they left her alone in the woods, bound and lying face down.

Returning to the city in Mrs. Collins' automobile, the defendant and Frazier drove to the SouthPark Shopping Center and, shortly after their arrival, observed Miss Underwood enter her car. The defendant then remarked to Frazier, "There's a hit." The defendant got out of the car, which was then driven by Frazier, went to Miss Underwood's car and forced his way into the passenger seat, she being in the driver's seat. A struggle followed and Miss Underwood was shot in the abdomen by the defendant with a .22 caliber pistol. Frazier then drove the stolen Collins vehicle up to the Underwood car and the defendant, driving the Underwood car, said to him, "Let's go." They left the parking lot, the defendant driving the Underwood vehicle and Frazier following in the Collins vehicle. They drove a short distance to a wooded area. There, Frazier got out of the vehicle he was driving and went to the passenger side of the Underwood vehicle, driven by the defendant. Miss Underwood was lying on the front seat with her head toward the door. When Frazier opened the door, standing outside the car, he put one leg up and propped it behind Miss Underwood's shoulder. She was trying to talk. The defendant then fired four more bullets into Miss Underwood's abdomen, holding the pistol only a few inches from her body as he fired. One of the bullets passed entirely through her body and into the leg of Frazier. Only six or seven minutes elapsed between the first shooting of Miss Underwood and the firing of the four additional bullets into her body.

The defendant and Frazier then removed Miss Underwood's body from the car. The defendant dragged her by the feet to some bushes where they left her after placing over her body a piece of plywood and an old carpet. The body was found three days later badly decomposed. An autopsy was performed in which four .22 caliber bullets were removed from the body,

a fifth wound resulting from the bullet which passed entirely through the girl's body and into the leg of Frazier. In the opinion of the County Medical Examiner, who conducted the autopsy, the cause of death was multiple gunshot wounds.

The defendant, in open court, through his counsel, made a judicial admission that the body of Carla Jean Underwood was so discovered on 21 June 1970 and examined by the medical examiner and that Miss Underwood died as the result of five gunshot wounds in the abdomen inflicted by .22 caliber bullets.

There is no suggestion that either the defendant or Frazier knew Miss Underwood or had ever seen her prior to this occasion.

Following the shooting of Miss Underwood and the disposal of her body, the defendant and Frazier, one driving the Collins car and the other driving the Underwood car, returned to the point where they had left Mrs. Collins. Not finding her there, they abandoned the Collins vehicle and, riding together in the Underwood vehicle, returned to the city and proceeded to a residence at which Mr. and Mrs. Bozart were visiting. They conversed with Mrs. Bozart briefly, then left and subsequently returned in about twenty minutes. This time they were met at the door by Mr. Bozart and after a brief conversation again left. They then went to the defendant's house, from there to a dry cleaning establishment to pick up some clothes belonging to Frazier, carried these to Frazier's house and then drove to a point in the city at which Westbrook poured gasoline into the interior of the Underwood car and burned it. The City Fire Department arrived at the burning car at approximately 3:50 p.m.

After the burning of the Underwood car, Frazier, in order to obtain medical attention for his wound without accounting for it truthfully, falsely swore out a warrant against his father-in-law charging him with shooting Frazier. (The bullet removed from Frazier's leg was introduced in evidence and was a .22 caliber bullet fired from the same weapon as three of the bullets removed from Miss Underwood's body, the fourth bullet removed from her body being so distorted that it could not be determined from what weapon it was fired.)

State v. Westbrook

On cross-examination by the defendant, Frazier testified that he, himself, was also under indictment for the murder of Miss Underwood, that on 16 June he was arrested for armed robbery in Cabarrus County, and that he had also been arrested a short time earlier for cutting his wife on the street in Charlotte, posting a bond for his release pending trial on this charge. He further testified on cross-examination that he was then under a suspended sentence of two years for another offense, not specified, and had pending against him a charge of arson, a charge of assault on his wife by cutting her, a charge of shooting into his father-in-law's house, a charge of kidnapping (apparently the kidnapping of Mrs. Collins) and a charge of murder (apparently the murder of Miss Underwoood).

The defendant testified as a witness in his own behalf. The substance of his testimony was as follows:

He is 22 years of age. In 1966, while in high school, he was sentenced to prison for housebreaking. While serving this sentence, he escaped twice. He was paroled 5 January 1970. He got a job and was married 27 April 1970, but was laid off about the middle of May because his employer got caught up on its work. Thereafter, he became acquainted with Frazier. On 13 June, five days before the killing of Miss Underwood, he, Frazier and another man, committed an armed robbery in Concord.

On 18 June 1970, he requested Frazier to take him to his former employer's place of business to see about resuming his job. They traveled in Frazier's mother's car, the defendant driving. At Frazier's suggestion, they turned into a shopping center (Woolco) and parked. Frazier got out of the car and two or three minutes later the defendant followed him. When he overtook Frazier, he observed that Frazier was standing over Mrs. Collins who was lying on the ground, Frazier holding a .22 caliber pistol in his hand. The defendant helped Frazier put Mrs. Collins in the Collins car. He and Frazier took her out to a place off Highway 49 and, after tying her up, left her there, Frazier having taken from her pocketbook the money therein, which Frazier called "chump change."

Returning to the city in Mrs. Collins' car, they picked up Frazier's mother's car and left the Collins vehicle at the K-Mart parking lot. They proceeded in the Frazier car to the SouthPark

State v. Westbrook

Shopping Center, the defendant driving. When they stopped there, Frazier said, "I see a hit town," and immediately got out of the car, telling the defendant to follow him, which the defendant did in the Frazier car. When he reached the Underwood car, the defendant saw Frazier and Miss Underwood therein, Miss Underwood being seated in the driver's seat. When the defendant parked the Frazier vehicle and got out, he heard a shot. He rushed to the passenger's side of the Underwood car and saw Frazier and Miss Underwood struggling, Frazier having a pistol in his hand. The defendant grabbed the pistol through the car window and the pistol fired again, the shot striking Frazier in the leg. Thereupon, the defendant having released the pistol, Frazier commenced shooting Miss Underwood and shot her there in the parking lot more than twice. The defendant then followed Frazier out of the parking lot, Frazier driving the Underwood car containing Miss Underwood's body, and the defendant driving Frazier's mother's car. When they stopped and tried to remove Miss Underwood's body from the car, Frazier dropped her because of the injury to his leg. Miss Underwood's body was dragged about three feet and, at Frazier's request, the defendant handed him a piece of plywood which Frazier put over the body. The defendant threw some rags over it.

They then drove to Frazier's home, remaining there just long enough to leave the Frazier car. Thereupon, riding together in the Underwood car, the defendant driving, they went back to the K-Mart, where they had left the Collins vehicle. Frazier then got into the Collins car, the defendant continuing to drive the Underwood car, and they drove back out to where they had left Mrs. Collins, bound and lying in the woods. Their intent was to bring her back to the city and leave her bound in her car in the shopping center parking lot. They did not find Mrs. Collins where they had left her. They then left the Collins car there and returned to the city in the Underwood vehicle. Thereupon, they stopped at the house where they saw Mr. and Mrs. Bozart. Following their second stop at this house, they went to the dry cleaning establishment to get Frazier's clothes. They took the clothes to Frazier's home and then drove the Underwood car to the place where it was set on fire and left burning, Frazier sprinkling the gasoline in the car and setting it on fire for the purpose of removing his fingerprints from within the car.

As they carried Mrs. Collins out to the wooded area where they bound and left her, the defendant heard Frazier tell Mrs. Collins that he wanted $5,000 from her. Statements given by Frazier and also those given by the defendant to the investigating officers concerning their activities on the day of the kidnapping of Mrs. Collins and the killing of Miss Underwood contained untruths.

In 1963 the defendant was convicted of seven counts of housebreaking and larceny. In 1966 he was convicted of unlawfully taking automobiles. He does not remember whether he was convicted in 1966 of three cases of housebreaking and larceny. On 16 November 1966, he escaped from prison and was convicted of that offense. He was again convicted of escape on 17 January 1967 and was indicted for larceny while an escapee the second time.

The defendant was the driver of the car in the robbery perpetrated by him, Frazier and their companion in Concord five days before the killing of Miss Underwood. In that robbery they used a sawed-off shotgun. In the course of the robbery, the defendant went into the store and at one time held the gun as he searched through the store for other occupants than those who were tied up by him and his companions. The victims of that robbery, who were tied and left in the store, were both women. The defendant has known how to steal since 1963 and needed no training by Frazier in that activity.

*Attorney General Morgan and Deputy Attorney General Moody for the State.*

*Ernest S. DeLaney, Jr., and Channing O. Richards for the defendant.*

LAKE, Justice.

[1-3] The defendant's first assignment of error is to the overruling of his motion to quash the bill of indictment. He does not assert that the indictment is insufficient in form or allegation. His contention is that to subject him to trial under this indictment upon the capital offense of first degree murder violates his rights under the Constitution of the United States and under the Constitution of North Carolina in that:

State v. Westbrook

(1) Pursuant to G.S. 14-17, the jury was vested with the absolute discretion, if it found him guilty of murder in the first degree, to elect between the penalty of death and the penalty of life imprisonment, which he contends is a violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States and a violation of Art. I, § 17, of the Constitution of North Carolina;

(2) Under G.S. 14-17, the jury was required to render simultaneously its verdict as to the issue of guilt and as to the punishment to be imposed, which he contends is a violation of his rights under the Fifth and Fourteenth Amendments to the Constitution of the United States; and

(3) The imposition of the death penalty for murder in the first degree is a cruel and unusual punishment in violation of the provisions of the Eighth and Fourteenth Amendments to the Constitution of the United States and of Art. I, § 14, of the Constitution of North Carolina.

G.S. 14-17 provides:

*"Murder in the first and second degree defined; punishment.—*

"A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death; Provided, if at the time of rendering its verdict in open court, the jury shall so recommend, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury. * * * * "

In *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L. Ed. 2d 711, 39 Law Week 4529, decided 3 May 1971, the Supreme Court of the United States held: (1) Nothing in the Constitution of the United States forbids a state to commit to the untrammeled discretion of the jury the power to determine whether a defendant found guilty of murder in the first degree shall be put to death or imprisoned for life; and (2) nothing in

the Constitution of the United States forbids a state to adopt a procedure whereby the jury shall return simultaneously its verdict upon the issue of guilt and its determination of the sentence to be imposed. In *Trop v. Dulles,* 356 U.S. 86, 99, 78 S.Ct. 590, 2 L. Ed. 2d 630, 641, the Supreme Court of the United States said: "Whatever the arguments may be against capital punishment * * * it cannot be said to violate the constitutional concept of cruelty."

In numerous cases, this Court has rejected attacks on constitutional grounds upon judgments imposing death sentences pursuant to the procedure followed in the present case. *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487; *State v. Roseboro,* 276 N.C. 185, 171 S.E. 2d 886; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241; *State v. Spence,* 274 N.C. 536, 164 S.E. 2d 593. In the Roseboro case, we held no constitutional right of the defendant is violated by the provision of G.S. 14-17 authorizing the jury, upon finding the defendant guilty of murder in the first degree, to determine whether the punishment shall be death or imprisonment for life, notwithstanding the absence from the statute of any standards to guide the jury in making that determination. In the Atkinson case, *supra,* at page 319, we held that the imposition of the death penalty for murder in the first degree is not, *per se,* a violation of the Fourteenth Amendment to the Constitution of the United States or of any provision of the Constitution of North Carolina. It is not cruel and unusual punishment in the constitutional sense, being expressly authorized by Art. XI, § 2, of the Constitution of North Carolina. *State v. Barber,* 278 N.C. 268, 179 S.E. 2d 404. No provision of the Constitution of this State supports the defendant's contention that the General Assembly may not provide, as it has done in G.S. 14-17, that the jury shall make its determination as to punishment at the same time it renders its verdict upon the question of guilt. *State v. Sanders, supra.* There is, therefore, no merit in the defendant's first assignment of error.

[4] The defendant's Assignment of Error No. 2 relates to the sustaining of the State's challenges for cause to 24 prospective jurors, the basis for each challenge being the prospective juror's statement on *voir dire* concerning his or her inability to return a verdict in any case which would result in the imposition of a sentence to death.

The *voir dire* examination of each prospective juror so challenged is set forth in detail in the record. It discloses that no juror was excused because of his or her expression of a general objection to the death penalty or of moral or religious scruples against inflicting it. Each was examined patiently, carefully and fairly by the prosecuting attorney and, in some instances, by the court. In a number of instances, due to equivocal statements by the prospective juror, apparently resulting from a lack of clear understanding of the question, the examination was lengthy. While there were variations in their statements, here, as in *State v. Sanders, supra*, "It is perfectly clear from these answers * * * that each of these prospective jurors, before hearing any of the evidence, had already made up his mind that he would not return a verdict pursuant to which the defendant might lawfully be executed whatever the evidence might be."

The sustaining of the State's challenges for cause was not contrary to the decision of the Supreme Court of the United States in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L. Ed. 2d 776, in which the Court expressly stated that it did not have before it the right of the prosecution to challenge for cause prospective jurors "who say that they could never vote to impose the death penalty." *State v. Sanders, supra; State v. Miller*, 276 N.C. 681, 174 S.E. 2d 481; *State v. Atkinson, supra*. There is, therefore, no merit in the defendant's Assignment of Error No. 2.

[5] The defendant's Assignment of Error No. 3 is directed to the court's excusing Mrs. Foster from the jury after she was accepted both by the State and by the defendant and was sworn, but before the selection of the jury was completed and the jury was impaneled. She had not, in the meantime, been in contact with any of the jurors previously selected. After she was sworn and conducted from the courtroom, pending the further interrogation of prospective jurors, she was brought back and, in the absence of other jurors, she, a great grandmother, informed the court that she was greatly needed at home to care for a son-in-law so afflicted with multiple sclerosis that he could not care for himself, and her husband, who was also under the care of a physician, her daughter being necessarily absent from home during the day by reason of her employment. She did not make any of these circumstances known prior to

being sworn as a juror. Over objection by counsel for the defendant, the court, in its discretion, excused Mrs. Foster on the ground of hardship. In this we find no error. See *State v. Atkinson, supra; State v. Spence,* 271 N.C. 23, 32, 155 S.E. 2d 802, judgment vacated on another ground, 392 U.S. 649, 88 S.Ct. 2290, 20 L. Ed. 2d 1350.

The record shows that the defendant did not exhaust the peremptory challenges allowed him by G.S. 15-163. It further shows that after the selection of the jury was completed and the jury was impaneled, the defendant, in response to an inquiry by his counsel, informed the court that the defendant had been consulted by his counsel concerning every juror and had expressed his approval of every juror accepted as a member of the jury which tried him. There is no merit in this assignment of error.

The defendant's Assignments of Error 4 through 14 relate to rulings of the court on the admission of evidence.

[6] There was no error in the admission of the two photographs of the body of Miss Underwood, the court instructing the jury that they were to be considered solely for the purpose of illustrating the testimony of the witness. In *State v. Atkinson, supra,* at page 311, we said, "[I]n a prosecution for homicide, photographs showing the condition of the body when found, the location where found and the surrounding conditions at the time the body was found are not rendered incompetent by their portrayal of the gruesome spectacle and horrifying events which the witness testifies they accurately portray." See also *State v. Gardner,* 228 N.C. 567, 46 S.E. 2d 824.

[7] Likewise, the admission in evidence of the articles of clothing found upon Miss Underwood's body was not error. The location of the bullet holes in her dress and the presence thereon of stains, identified by an expert witness as powder burns, were material and tended to show, as Frazier subsequently testified, that when the shots were fired the pistol was held close to the victim's body. As to the admission of clothing in evidence, see: *State v. Atkinson, supra,* at page 310; *State v. Bass,* 249 N.C. 209, 105 S.E. 2d 645; *State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294; *State v. Fleming,* 202 N.C. 512, 163 S.E. 453.

[8] These exhibits were competent notwithstanding the admission by the defendant, through his counsel, in open court, that the body was that of Miss Underwood, that it was discovered in a wooded area, partially hidden under boards and an old quilt and in a state of decomposition, and that the cause of death was five gunshot wounds in the abdomen. Notwithstanding these admissions, the circumstances with reference to the shooting of the deceased and the disposition of her body were material upon the question of the degree of the homicide and the decision as to the punishment to be inflicted, if the jury should find the defendant guilty of murder in the first degree.

[8, 9] In *State v. Westmoreland,* 181 N.C. 590, 107 S.E. 438, this Court said, "There are authorities for the position that any unseemly conduct toward the corpse of the person slain, or any indignity offered it by the slayer, and also concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying, depending, of course, upon the particular circumstances of the case." In 40 C.J.S., Homicide, § 211, it is said, "Any unseemly conduct toward the corpse of the person slain or any indignity offered it by the slayer should go to the jury on the question of malice." See also *State v. Robertson,* 166 N.C. 356, 363, 81 S.E. 689. Evidence bearing upon the atrocity of the offense and the callous disregard exhibited by the defendant toward the victim is especially relevant and material when, as here, the punishment to be imposed is to be fixed by the jury in its discretion. A defendant cannot deprive the State of the right to place before the jury all the circumstances of a homicide by admitting the bare facts as to identity, the location where the body was found, its general condition and the cause of death. The State is entitled to ask the jury, not only to find the defendant guilty of murder in the first degree but also to impose the death penalty. G.S. 15-176.1. It follows, necessarily, that it may introduce evidence, otherwise competent, to support such a verdict.

[10] It appearing from the testimony of Frazier that he and the defendant had been acting in concert throughout the day, there was no error in permitting him to testify as to why he and the defendant went twice to the residence where they saw Mr. and Mrs. Bozart and that the defendant knew the lady who lived at the house, his grandmother having formerly worked there. Subsequently, the defendant testified that he did know

the people who lived there and that they first stopped at the house to seek permission to use the telephone, which he said was Frazier's idea, and returned to get water. In response to the question, "If that lady had come to that door, there would have been another killing and robbery out there, wouldn't there?" the defendant testified, "No, there wouldn't have." The admission of this evidence was not prejudicial to the defendant, the fact of the two visits to the house, where Mr. and Mrs. Bozart were visiting, having been previously established by their testimony.

[11] After Frazier, the State's witness, had testified as to the circumstances of the killing of Miss Underwood, he testified that he had given to the investigating police officers a signed statement with reference thereto, which statement he supplemented with another fifteen or twenty minutes later, he having failed to tell the officers "all the truth" in the first statement. He was then permitted, over objection, to read from the supplementary statement. It related to their departure from the parking lot following the first shooting, their driving to the wooded area, the further shooting of Miss Underwood and the disposal of her body and was in substantial accord with the testimony of Frazier at the trial. The court properly instructed the jury that it was not substantive evidence but was to be considered by them with reference to the weight and credit they would give to Frazier's testimony if the jury found the statement corroborated his testimony. In this there was no error. *State v. Norris,* 264 N.C. 470, 141 S.E. 2d 869; *State v. Case,* 253 N.C. 130, 116 S.E. 2d 429.

[12] On cross-examination by the defendant concerning these two statements, Frazier testified that the earlier one contained a markedly different version of the killing from that set forth in the supplement which had been read by him to the jury on his direct testimony. On redirect examination, the State was permitted to read to the jury the earlier statement. This earlier statement given by him to the police officers was substantially in accord with Frazier's testimony concerning the theft of the automobiles, the arrival of Frazier and the defendant at the SouthPark Shopping Center, their observance of Miss Underwood, the defendant's getting into her car and Frazier's hearing a shot thereafter. This statement omitted any account of the killing of Miss Underwood and the disposal of her body, except

that the following week Frazier heard that she was dead. It did corroborate his testimony with reference to the subsequent driving about and the burning of the Underwood car. There was nothing in this statement which contradicted Frazier's testimony as to the shooting of Miss Underwood and the disposition of her body. In view of the cross-examination of Frazier with reference to this statement and its tendency to corroborate other portions of his testimony, there was no error in admitting this statement into evidence, the court again instructing the jury that it was admitted not as substantive evidence but only for consideration as to the weight and credit to be given to Frazier's testimony if they found the statement corroborated that testimony.

[13] For the same reason, the defendant's objections to the admission of the testimony of Officer Painter, concerning the statements made to him by Frazier and Frazier's taking him over the route followed by Frazier and the defendant, are without merit. The court instructed the jury that this testimony was not substantive evidence but was to be considered by the jury only in determining the weight and credit it would give the testimony of Frazier, it being for the jury to determine whether or not the officer's testimony corroborated that of Frazier. It did so in all respects except that Officer Painter testified that Frazier had stated to the officer that the purpose for which he and the defendant went to the house where they saw Mr. and Mrs. Bozart was to rob a safe in the house. Frazier, in his testimony, made no mention of a safe in the house. Where the testimony offered to corroborate a witness does so substantially, it is not rendered incompetent by the fact that there is some variation. *State v. Case, supra.*

[14] On cross-examination, Frazier testified that, between the time he signed his first statement to the investigating officers and the time he signed the supplementary statement above mentioned, the officers read to him a portion of a statement made to them by the defendant, designated Defendant's Exhibit 9. Officer Painter testified to the same effect and designated the portion of the exhibit so read to Frazier. The defendant assigns as error the refusal of the court, on objection by the State, to permit him to cross examine Frazier concerning the contents of that portion of Defendant's Exhibit 9 which was so read to him by the officers. He also assigns as error the refusal of the

court, on objection by the State, to permit Officer Painter, upon cross-examination, to read the portion of Defendant's Exhibit 9 which Officer Painter so read to Frazier. The defendant further assigns as error the court's sustaining of the State's objection to his offer of Defendant's Exhibit 9 in evidence. This offer of proof was made in the absence of the jury immediately prior to the State's resting its case. It appears, however, that the offer and the court's ruling were made at that time as a matter of convenience and were treated as if made at the commencement of the defendant's evidence.

There was no error in these rulings. At the time they were made, the defendant had not testified. His declaration to the officers could not, therefore, have been then admitted as corroboration of his testimony. In any event, the record shows that, at the conclusion of the defendant's testimony, his Exhibit 9 was again offered in evidence by the defendant and was admitted. Thus, had there been error in the prior rulings of the court, it was cured. Consequently, there is no merit in the defendant's Assignments of Error 8, 11 and 13 relating to these rulings.

[15] The defendant's Assignments of Error 5 and 10, relating to the admission, over objection, of evidence offered by the State are not brought forward into the brief and are, therefore, deemed abandoned. Rule 28 of the Rules of Practice in the Supreme Court. We have, nevertheless, considered all of the defendant's exceptions to the admission or exclusion of evidence, including those to which these abandoned assignments relate. We find therein no basis for the granting of a new trial.

The defendant assigns as error portions of the argument to the jury by the privately employed prosecuting attorney, whose argument is set out in full in the record. The record does not contain the argument of defense counsel.

The prosecution of one charged with a criminal offense is an adversary proceeding. The prosecuting attorney, whether the solicitor or privately employed counsel, represents the State. It is not only his right, but his duty, to present the State's case and to argue for and to seek to obtain the State's objective in the proceeding. That objective is not conviction of the defendant regardless of guilt, not punishment disproportionate to the offense or contrary to the State's policy. It is the con-

viction of the guilty, the acquittal of the innocent and punishment of the guilty, appropriate to the circumstances, in the interest of the future protection of society. In the discharge of his duties the prosecuting attorney is not required to be, and should not be, neutral. He is not the judge, but the advocate of the State's interest in the matter at hand.

[16, 17] It is the policy of this State, as declared in its Constitution, Art. XI, § 1, and by the General Assembly in G.S. 14-17, that one convicted of murder in the first degree, after a fair trial in accordance with the law, shall be put to death if the jury does not, in its discretion, recommend punishment by imprisonment for life. In the present instance, the grand jury, an agency of the State, after investigation according to law, indicted the defendant for murder in the first degree. The solicitor, an officer of the State, after investigation, determined, on behalf of the State, that the defendant should be tried for this offense and that the death penalty should be sought. These determinations having been made on behalf of the State, it was the right and duty of the prosecuting attorney, vigorously, but fairly and in accordance with law, both in the presentation of evidence and in his argument, to seek that result. G.S. 15-176.1 expressly provides that the solicitor or other counsel appearing for the State may argue to the jury that a sentence of death should be imposed and that the jury should not recommend life imprisonment.

In the present case, the defendant contends that the prosecuting attorney passed over the boundary of this right and duty in his argument to the jury by his vigorous denunciation of the defendant and thereby denied him a fair trial. If this contention is correct, the defendant is entitled to a new trial. In *State v. Smith*, 279 N.C. 163, 181 S.E. 2d 458, decided this day, we have awarded the defendant therein a new trial upon a charge of the utmost gravity, because there the record shows the solicitor violated the right of the defendant to a fair trial by the nature of his argument to the jury. In the present case, as there, it is our duty to make this determination from the record, irrespective of our views as to the policy of the State with regard to the punishment of the offense in question and without regard to the sufficiency of the evidence to support the verdict and sentence.

The guiding principle is thus stated in 23A C.J.S., Criminal Law, § 1081:

"In the trial of a criminal case, a high and important duty and responsibility are imposed on the prosecuting attorney. It is his duty to see that the state's case is properly presented with earnestness and vigor, and to use every legitimate means to bring about a just conviction; but he has the duty to refrain from improper methods calculated to produce a wrongful conviction, and while he may strike hard blows, he is not at liberty to strike foul ones."

In amplification of this principle, it is said in this treatise:

It is the duty of the prosecuting attorney "to show the whole transaction as it was." § 1081. "[H]owever, the efforts of a prosecuting attorney discharging his duty, not only to punish crime, but to deter others, should not be so encompassed as to discourage vigorous arguments to the jury in the solicitor's own style." § 1083. He has much latitude in the language or manner of presenting his side of the case "consistent with the facts in evidence." § 1090. "Generally, the gravity of the crime charged, the volume of evidence, credibility of witnesses, inferences to be drawn from various phases of evidence, and legal principles involved, to be presented in instructions to the jury, are all matters within the proper scope of argument." § 1090. "As warranted by the record, the prosecuting attorney may in a proper manner comment on the credibility of witnesses for accused. Accordingly, where the evidence justifies it, it is not error for the prosecuting attorney to state, in his argument, that a witness is untruthful or that his testimony is false * * * . However, abusing the witnesses for accused, making remarks which reflect on their credibility or character * * * is improper, unless such a statement is reasonably justified by the circumstances or evidence." § 1097. "The prosecuting attorney may allude to other crimes committed by the accused where there is evidence properly before the jury supporting the particular reference." § 1100. "Generally, it is not improper for the prosecuting attorney to comment on, and make inferences from, the conduct of the accused, where the purported facts referred to are supported by competent evidence and the inferences sought to be made are within the bounds of proper argument; such comments may be couched in denunciatory or opprobrious terms appropriate to the evidence adduced." § 1102.

"The prosecuting attorney may appeal to the jury to do their full duty in enforcing the law, and may employ any legitimate means of impressing on them their true responsibility in this respect, or may urge a severe penalty." § 1107.

[18-20] This Court has said that the argument of counsel must be left largely to the control and discretion of the presiding judge and that counsel must be allowed wide latitude in the argument of hotly contested cases. *State v. Seipel,* 252 N.C. 335, 113 S.E. 2d 432; *State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424; *State v. Bowen,* 230 N.C. 710, 55 S.E. 2d 466; *State v. Little,* 228 N.C. 417, 45 S.E. 2d 542. He may not, however, by argument, insinuating questions, or other means, place before the jury incompetent and prejudicial matters not legally admissible in evidence, and may not "travel outside of the record" or inject into his argument facts of his own knowledge or other facts not included in the evidence. *State v. Phillips,* 240 N.C. 516, 82 S.E. 2d 762; *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664; *State v. Little, supra.* On the other hand, when the prosecuting attorney does not go outside of the record and his characterizations of the defendant are supported by evidence, the defendant is not entitled to a new trial by reason of being characterized in uncomplimentary terms in the argument. *State v. Bowen, supra.*

[21] The prosecuting attorney may use "appropriate epithets which are warranted by the evidence," *People v. Turville,* 51 Cal. 2d 620, 335 P. 2d 678, *cert. den.,* 360 U.S. 939, and "may vigorously urge the jury to convict and to impose the death penalty in the light of the evidence." *People v. Wein,* 50 Cal. 2d 383, 326 P. 2d 457, *cert. den.,* 358 U.S. 866. In *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717, *cert. den.,* 336 U.S. 969, the epithet, "a small-time racketeering gangster," applied to the defendant in the argument of the private counsel for the prosecution, was not supported by anything in the record and a new trial was ordered. In *State v. Bowen, supra,* the epithet, "these two thieves," was not approved by this Court but was held not to be ground for a new trial because it was "a conclusion drawn from the evidence." In 53 Am. Jur. Trial, § 504, note 8, it is said, "The line between denunciation and abuse which will reverse a conviction, and that which will not, * * * seems to rest on the distinction between mere personal abuse and invective called forth by the character of the crime shown by the evidence." In

*Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L. Ed. 1314, the Court said the prosecuting attorney's argument to the jury contained improper insinuations and assertions calculated to mislead the jury. Likewise, in *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335, "with no supporting evidence the solicitor defiled the characters of the defendants in his argument to the jury" and this Court, acting under its supervisory power over the lower courts, granted a new trial.

[22-26] Applying these principles to the present case, we find, in the vigorous argument of the prosecuting attorney and his urging that the jury return a verdict of guilty of murder in the first degree without a recommendation as to punishment, which, in effect, fixes the punishment at death by asphyxiation, no departure from the evidence and legitimate inferences to be drawn therefrom. His catalogue of the criminal offenses committed on the day of Miss Underwood's death, and on previous occasions, by the defendant and his alleged accomplice, was merely a summary of their own testimony. His characterization of them as "two robbers, two thieves, two gunmen, who practiced their trade with a sawed-off shotgun," cannot be deemed to have prejudiced the defendant unfairly in the eyes of the jury in view of his own testimony that he and Frazier had, a few days prior to the killing of Miss Underwood, held up and robbed a place of business in Concord, using a sawed-off shotgun, had on that occasion and on the one in question stolen one or more automobiles, that he "knew how to steal a long time ago" and was "not only a thief but * * * also a robber." The defendant being charged on this trial with murder in the first degree, it was not improper for the prosecuting attorney to characterize him and his companion as "killers." The characterization of them as "loafers," if not expressly supported by the evidence, could hardly be deemed prejudicial under the circumstances. In view of the defendant's criminal record, as disclosed by his own testimony, the prosecuting attorney's observation that the defendant's testimony, "I don't go for violence," was not "truthful" barely measures up to the minimum standard of a vigorous argument. It was not unfairly prejudicial for the prosecuting attorney to remind the jury of the callous contempt, with which the testimony of the defendant, himself, and of his companion, Frazier, disclosed that they disposed of the body of Miss Underwood. His comment concerning the treatment of Mrs. Collins earlier on the same day was

fully supported by the defendant's own testimony concerning that activity.

The distinction between this case and *State v. Smith, supra,* decided this day, is that in *State v. Smith,* the prosecuting attorney, in his argument, "traveled outside the record," used language offensive in its nature, and, in support of his plea for the death penalty, injected into his argument his own account of his record as a solicitor in other cases, for the purpose of persuading the jury that he did not ask the death penalty where it was not deserved. In the present case, the prosecuting attorney, while making a vigorous plea for the imposition of the death penalty, did not depart from or distort the record. We find nothing in his argument which would tend to mislead the jury or deprive the defendant of a fair trial. In *State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667, a judgment imposing the death penalty was affirmed although "the solicitor reviewed the evidence and argued with great zeal and fervor that in the light of the defendant's conduct in connection with the killing of [the victim], the punishment therefor should be death and the jury should bring a verdict of guilty of murder in the first degree without a recommendation that the punishment should be life imprisonment." There is no merit in this assignment of error.

The defendant's Assignments of Error 18 and 19 relate to exceptions to the charge of the court to the jury. We have carefully examined the entire charge and find therein no error.

[27]   The court instructed the jury that one of the theories upon which the State was proceeding was that the defendant and Frazier were acting in concert. He thereupon charged the jury correctly that the mere presence of a person at the scene of a crime at the time of its commission does not make him guilty of the offense, but that if two persons are acting together, in pursuance of a common plan and common purpose to rob, and one of them actually does the robbery, both would be equally guilty within the meaning of the law and if "two persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose; that is, the common plan to rob,

or as a natural or probable consequence thereof." In this we find no error.

[29]  The court then instructed the jury: "Now in order to show a community of unlawful purpose, it is not necessary to show an express agreement or an understanding between the parties, nor is it necessary that the conspiracy or common purpose shall be shown by positive evidence. Its existence may be inferred from all the circumstances accompanying the doing of the unlawful act, and from conduct of the defendant subsequent to the criminal act. In other words, preconcert or a community of purpose may be shown by circumstances as well as by direct evidence." The defendant contends that this instruction was error for that the court should further have instructed the jury that circumstantial evidence is sufficient to justify a conviction when, and only when, the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with the hypothesis that he is innocent and with every other reasonable hypothesis except that of guilt.

In the present case, Frazier testified that when he and the defendant left the defendant's home on the morning of these events: "We were going to those two places [the Woolco Shopping Center and the K-Mart] looking for transportation, looking for a car. We needed transportation to get out of town. We were going to take the car. We did not have a car parked up there. We were going to take any car we see. From Woolco we went to SouthPark [where Miss Underwood was shot and her car taken]." This is direct evidence of concerted action.

[28]  As the trial court instructed the jury, such concert of action may also be shown by circumstances accompanying the unlawful act and conduct of the defendant subsequent thereto. While circumstantial evidence is sufficient to justify a conviction when, and only when, the circumstances proved are consistent with the hypothesis of guilt and inconsistent with every other reasonable hypothesis, this Court has repeatedly held that no set form of words is required to be used in conveying to the jury this rule relating to the degree of proof required for conviction upon circumstantial evidence. *State v. Lowther,* 265 N.C. 315, 144 S.E. 2d 64; *State v. Shoup,* 226 N.C. 69, 36 S.E. 2d 697; *State v. Shook,* 224 N.C. 728, 32 S.E. 2d 329.

In *State v. Lowther, supra,* upon which the defendant relies, a new trial was granted because the court, after instructing the jury that the State relied upon circumstantial evidence and instructing them that such evidence is a recognized instrumentality in North Carolina and highly acceptable in matters of grave moment, added only this: "[B]ut the circumstances and conditions relied upon must be such as are not only consistent with guilt, but must be inconsistent with innocence." This Court said that such charge "on circumstantial evidence is inadequate and prejudicial, and entitles defendant to a new trial."

In *State v. Shook, supra,* it is said:

"The objection is that the judge did not add to the instruction given that, in order to justify a verdict of guilty, the circumstantial evidence must 'exclude every reasonable hypothesis of innocence.' That, indeed, it must do; but after all, the convincing effect of circumstantial evidence on the mind of the jury is measured by the same standard of intensity required of any other evidence—the jury must be convinced beyond a reasonable doubt as to every element of the crime before they find the defendant guilty of it, whether the evidence is wholly circumstantial, only partly so, or entirely what we sometimes refer to as direct. No set formula is required to convey to the jury this fixed principle relating to the degree of proof required for conviction."

In *State v. Adams,* 138 N.C. 688, 50 S.E. 765, this Court said:

"There is no particular formula by which the Court must charge the jury upon the intensity of proof. 'No set of words is required by the law in regard to the force of circumstantial evidence. All that the law requires is that the jury shall be clearly instructed, that unless after due consideration of the evidence they are "fully satisfied" or "entirely convinced" or "satisfied beyond a reasonable doubt" of the guilt of the defendant, it is their duty to acquit, and every attempt on the part of the courts to lay down a "formula" for the instruction of the jury, by which

to "gauge" the degrees of conviction, has resulted in no good.' We reproduce these words from the opinion delivered by *Pearson, C.J.*, in *S. v. Parker*, 61 N.C. 473, as they present in a clear and forcible manner the true principle of law upon the subject."

In *State v. Warren*, 228 N.C. 22, 44 S.E. 2d 207, Justice Denny, later Chief Justice, speaking for the Court, said:

"This defendant also assigns as error the failure of the trial judge to define circumstantial evidence and to instruct the jury how to appraise or evaluate such testimony. In the absence of a request to do so, the failure of the court to instruct the jury regarding circumstantial evidence, or as to what such evidence should show, will not be held for reversible error, if the charge is correct in all other respects as to the burden and measure of proof. * * *

"It makes no difference whether the State is relying on circumstantial or direct evidence, or both, the evidence must produce in the mind of the jurors a moral certainty of the defendant's guilt, otherwise the State has not proven his guilt beyond a reasonable doubt."

[29] In the present case, the court instructed the jury that the presumption of the defendant's innocence remained with him and surrounded him throughout the trial and "entitles him to a verdict of not guilty unless and until the State has satisfied you of his guilt beyond a reasonable doubt." He then instructed the jury: "A reasonable doubt is not a vain, imaginary or fanciful doubt, but it is a sane, rational doubt. It means that you must be entirely convinced or fully satisfied, or satisfied to a moral certainty of the truth of the charge." As to the contention with reference to a common plan, the court charged the jury:

"If the State has satisfied you from the evidence and beyond a reasonable doubt, that the defendant Westbrook and Frazier, on June 18, 1970, entered into a common plan and purpose to rob Carla Jean Underwood, and that the defendant Westbrook was present, acting in concert with, or aiding and abetting Frazier, in pursuance of a common plan and purpose to rob Carla Jean Underwood, and that Frazier shot and killed Carla Jean Underwood while com-

mitting or attempting to commit the felony of robbery, it would be your duty to return a verdict of guilty of murder in the first degree.

"If the State has failed to so satisfy you or if you have a reasonable doubt as to the guilt of the defendant Westbrook, it would be your duty to return a verdict of not guilty."

At the conclusion of the charge, the court called counsel for the defendant and the solicitor to the bench and inquired if they desired any additions to or corrections of the charge. Each answered in the negative.

No error.