STATE OF NORTH CAROLINA v. CHRISTENE KNAPP KEMMERLIN

No. 182A01

(Filed 20 December 2002)

## 1. Confessions and Incriminating Statements— motion to suppress—no formal arrest—no restraint on movement

The trial court did not err in a first-degree capital murder prosecution by denying defendant's motion to suppress her statement given to SBI special agents during an interview on 25 March 1999 even though defendant contends the conditions of the interview constituted a restraint on her freedom of movement to the degree associated with a formal arrest, because: (1) defendant was advised before the interview began that she was not under arrest and could leave at any time, and defendant admitted that she understood these instructions; (2) at no time during the interview was defendant restrained in her freedom of movement; (3) defendant was given ample opportunity to interrupt the interview to get something to eat or drink or to use the bathroom, but declined to do so; and (4) at the conclusion of the interview, defendant was not guarded by law enforcement officers but instead was allowed to move freely throughout the sheriff's department.

## 2. Confessions and Incriminating Statements— motion to suppress—handwritten statement—voluntariness

The trial court did not err in a first-degree capital murder prosecution by denying defendant's motion to suppress her handwritten statement resulting from the interview contemporaneous with her arrest on 26 March 1999 even though defendant contends it was simply another version of her 25 March 1999 statement that allegedly should have been suppressed, because: (1) even though it was a mere reduction to writing by an officer of defendant's earlier statement on 25 March 1999, it was admissible just as the 25 March 1999 statement was admissible; (2) the totality of the circumstances demonstrated that the handwritten statement was made voluntarily when defendant was advised of her Miranda rights and chose to waive them, at no point in time was defendant threatened or coerced, defendant never indicated that she was tired or wished to terminate the interview nor did she request the assistance of counsel, and defendant was not interrogated further although she remained at the sheriff's

**STATE v. KEMMERLIN**

[356 N.C. 446 (2002)]

department following the conclusion of her confession; and (3) defendant failed to reveal how she suffered any prejudice by the admission of both the 25 March and 26 March statements.

**3. Jury— selection—capital trial—consideration of life sentence—bias**

The trial court did not abuse its discretion in a first-degree capital murder prosecution by preventing defendant from exploring whether a prospective juror could consider a life sentence for premeditated murder given her personal knowledge of early release from life sentences for murder, because: (1) the trial court verified that all prospective jurors could and would impartially consider the evidence regarding mitigating and aggravating circumstances; (2) defendant was allowed to ask prospective jurors if they understood that some first-degree murders do not deserve the death penalty; (3) the pertinent prospective juror informed the court that she understood that not all first-degree murders merit death, she did not feel that her prior associations with murder would affect her ability to be fair and impartial in defendant's case, and she would not automatically vote for the death penalty upon conviction; and (4) the trial court's jury instructions during the penalty phase sufficiently cured any potential misconception regarding life imprisonment without parole.

**4. Jury— selection—capital trial—excusal for cause—views on capital punishment—rehabilitation of juror**

The trial court did not abuse its discretion in a first-degree capital murder prosecution by excusing for cause three prospective jurors on the grounds that each would be unable to return a sentence of death and by denying defendant's request to rehabilitate two of those prospective jurors, because: (1) a defendant may not rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the sentencing court; (2) a prospective juror is properly excused for cause when his answers on voir dire concerning his attitudes toward the death penalty, although equivocal, show when considered contextually that regardless of the evidence he would not vote to convict defendant if conviction meant the imposition of the death penalty; and (3) based on its own observations, the trial court found one of the prospective jurors was emotional and believed that the court felt she was lying, and that the prospective juror was uncertain about

STATE v. KEMMERLIN

[356 N.C. 446 (2002)]

her ability to refrain from allowing her personal views to affect her responsibilities as a juror.

## 5. Criminal Law— prosecutor's argument—defendant's confession

The trial court did not err in a capital first-degree murder prosecution by failing to intervene ex mero motu to prohibit the prosecutor's statements during closing arguments that the jury would not have heard defendant's confession unless the trial court had determined it was properly taken and reliable, because: (1) the prosecutor simply reminded the jury that no evidence could be presented to them without a determination that it was proper for them to hear, and whether the statement was trustworthy and credible remained a fact for the jury to decide; and (2) defendant has failed to show how the prosecutor's comments infected the trial with unfairness rendering the conviction fundamentally unfair.

## 6. Robbery— dangerous weapon—motion to dismiss—sufficiency of evidence—intent to deprive

The trial court did not err in a first-degree capital murder case by denying defendant's motion to dismiss the charge of robbery with a dangerous weapon based on alleged insufficient evidence of the element of intent to deprive, because viewed in the light most favorable to the State the evidence showed that: (1) defendant and a coparticipant conspired to make the crime scene look like a robbery, and the coparticipant drove off in the victim's truck after killing defendant's husband and abandoned the vehicle three miles from defendant's residence; (2) abandonment of a vehicle, regardless of how near the abandonment is to the scene of the crime, places it beyond a defendant's power to return the property and shows a total indifference as to whether the owner ever recovers it; and (3) the evidence that the coparticipant took the vehicle and subsequently abandoned it near the crime scene was sufficient to show an intent to permanently deprive the victim of his property.

## 7. Constitutional Law— double jeopardy—first-degree murder by acting in concert—solicitation to commit murder—conspiracy to commit murder—not a lesser-included offense

The trial court did not err in a first-degree capital murder case by failing to vacate the convictions of solicitation to commit

STATE v. KEMMERLIN

[356 N.C. 446 (2002)]

murder and conspiracy to commit murder even though defendant asserts that both convictions merge with the conviction for first-degree murder by acting in concert and that punishment for both crimes allegedly violates double jeopardy, because: (1) the crime of solicitation requires counseling, enticing, or inducing another to commit a crime whereas this element is not required for acting in concert; (2) acting in concert requires actual or constructive presence at the crime which is not an element present in the definition of solicitation; (3) regarding defendant's contention that her conspiracy conviction also merged based on her allegation that her presence at the scene of the murder was incidental and unnecessary, defendant was not only present at the scene of the murder but she also let the coparticipant into her home knowing he was going to kill her husband and she also brought her husband into the room where he would be killed; (4) conspiracy is a separate offense from the substantive offense and therefore does not merge into the substantive offense; and (5) the requirement of an agreement which is an element of conspiracy is not a necessary element for murder by acting in concert.

**8. Sentencing— capital—mitigating circumstances—accomplice or accessory with minor participation**

The trial court did not err in a first-degree capital murder prosecution by failing to instruct the jury on the N.C.G.S. § 15A-2000 (f)(4) mitigating circumstance that defendant was an accomplice in or accessory to the capital felony committed by another person and her participation was relatively minor, because defendant has not met her burden of producing substantial evidence to warrant its submission.

**9. Sentencing— capital—mitigating circumstances—impaired capacity to appreciate criminality of conduct—inability to conform conduct to law**

The trial court did not err in a first-degree capital murder sentencing proceeding by failing to instruct the jury on the N.C.G.S. § 15A-2000 (f)(6) mitigating circumstance that defendant's capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law was impaired, because: (1) defendant's own expert testified that her mental or emotional disturbance did not prevent defendant from appreciating the criminality of her conduct and from controlling her conduct as required by law; and (2) defendant failed to offer any other substantial evidence of this circumstance.

STATE v. KEMMERLIN

[356 N.C. 446 (2002)]

**10. Criminal Law— capital sentencing—prosecutor's improper questions and argument—right to jury trial—right not to testify—curative actions by court**

The trial court took sufficient action to cure any possible prejudice from the prosecutor's comments on defendant's exercise of her right to a jury trial and her right not to testify while questioning defendant during a capital sentencing proceeding where the court identified the questions that were allegedly improper, instructed the jury on defendant's right to plead not guilty and told the jury that questions pertaining to this right could not be considered, and instructed the jury that defendant's exercise of her right not to testify could not be held against her. Furthermore, assuming arguendo that the prosecutor's jury argument in the capital sentencing proceeding contained improper references to defendant's exercise of her constitutional rights to plead not guilty and to not testify in the guilt-innocence phase, any possible prejudice was cured when the trial court ordered the remarks stricken from the record and instructed the jury that it "could not consider that argument as it relates to some issue on defendant's constitutional right," and any error would be harmless beyond a reasonable doubt because the jury had already found defendant guilty of first-degree murder, and the remarks do not refer to any aggravating circumstances proffered by the State or mitigating circumstances proffered by defendant.

**11. Sentencing— death penalty—disproportionate**

The trial court erred in a first-degree capital murder prosecution by sentencing defendant to the death penalty based on the fact that this crime does not rise to the level of those murder cases in which the death sentence has been found proportionate under N.C.G.S. § 15A-2000(d)(2), and defendant is sentenced to life imprisonment without parole because: (1) the evidence supporting the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance that the murder was committed for pecuniary gain was weak; (2) defendant considered stopping the murder immediately prior to its occurrence; (3) defendant's codefendant received a life sentence without parole; and (4) the jury found three statutory mitigating circumstances and three nonstatutory mitigating circumstances.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Frye, J., on 17 October 2000 in Superior Court, Rockingham County, upon a jury verdict find-

ing defendant guilty of first-degree murder. On 6 August 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to her appeal of additional judgments. Heard in the Supreme Court 9 September 2002.

*Roy Cooper, Attorney General, by David Roy Blackwell, Special Deputy Attorney General, for the State.*

*Kathryn L. VandenBerg for defendant-appellant.*

WAINWRIGHT, Justice.

On 5 April 1999, Christene Knapp Kemmerlin (defendant) was indicted for the first-degree murder of her husband, Donald Wayne Kemmerlin; for conspiracy to commit murder; for solicitation to commit murder; and for robbery with a dangerous weapon. Defendant was tried capitally before a jury at the 18 September 2000 session of Superior Court, Rockingham County. The jury found defendant guilty of all charges. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder, and the trial court entered judgment in accordance with that recommendation. The trial court also sentenced defendant to consecutive sentences for the other convictions. For the reasons discussed herein, we conclude that the pre-trial issue, jury selection, guilt-innocence phase, and sentencing proceeding were free of prejudicial error but that the death sentence was disproportionate.

Evidence presented at trial showed that defendant and her husband rented a house from Charles A. Davis at 619 Madison Street in Reidsville, North Carolina. Davis lived near the Kemmerlins, at 625 Madison Street. At around 8:00 p.m. on 24 March 1999, defendant ran into Davis' trailer screaming that Wayne had been shot. Davis directed defendant to use his phone to call 911. Davis eventually took over the 911 call, and defendant returned to her home on foot. Davis completed the 911 call and drove to the Kemmerlin house.

Once inside the home, Davis observed Wayne Kemmerlin lying flat on his back on the floor. Davis checked for a pulse but could find none. Defendant called 911 a second time.

Sergeant Darryl M. Crowder of the Rockingham County Sheriff's Department was the first to respond to the scene at 8:13 p.m. After checking the residence to make sure no one else was present, Sergeant Crowder examined the body and found three to four gunshot wounds in the lower abdomen and one gunshot wound to the

right forearm. Defendant told Sergeant Crowder that a black male had shot her husband. She described the shooter as five foot ten inches tall, with a close-cut haircut and large lips. Defendant said the shooter was wearing a blue puffy coat and blue jeans. Defendant told Sergeant Crowder that she did not know the man.

According to defendant, the black male had come to the door and asked to use the phone because his car broke down. Defendant let the man in and went to get her husband. Defendant returned to the laundry room where she had been washing clothes. She heard the black male ask her husband what he owed him for using the phone. She then heard her husband say "No" at least twice. At that point, she heard shots fired and ran to Davis' home for help.

Sergeant Crowder found a ski mask in the kitchen but noted no signs of a struggle. Sergeant Crowder learned that the victim's company truck was missing from the scene. This truck was recovered a few hours later, having been abandoned approximately three to four miles from the Kemmerlin residence.

EMS personnel arrived shortly after Sergeant Crowder. Defendant asked one of the EMS paramedics if her husband was "going to make it." Although the body was still warm, the victim was not breathing, had no pulse, and appeared lifeless. CPR was administered but was unsuccessful.

Betty Jo Hurt, a nurse on duty in the emergency room at Annie Penn Hospital, was part of the team attempting to revive the victim. Despite their efforts, the victim was pronounced dead at 8:53 p.m. According to Hurt, defendant went to view the body and kept repeating, "I shouldn't have let him in."

Associate Chief Medical Examiner Karen Chancellor performed an autopsy on the victim's body on 25 March 1999. Doctor Chancellor concluded that gunshot wounds to the chest and back were the most likely cause of death.

Also on 25 March 1999, the Sheriff's Department received a phone call from Cynthia Vaughn Loftis indicating that defendant should be a suspect in the murder investigation. Ms. Loftis was concerned that her son, Jerry Loftis, might be in danger because defendant had been looking for him and he owed defendant money.

The police interviewed Jerry Loftis and learned that he had first met defendant through his girlfriend, Dori Gwynn, in the summer of

1998. Loftis admitted to beginning a sexual relationship with defendant at that time. In August 1998, upon learning that Loftis sold drugs, defendant gave Loftis money to buy drugs, sell them at a profit, and share the profit with her. Defendant also gave Loftis one hundred methadone pills to sell for her. Loftis never gave defendant any of the profits from the sale of drugs.

Defendant told Loftis that her husband was verbally and physically abusive to her. On several occasions, defendant asked Loftis if he knew someone who would kill her husband, Wayne, for the money she would receive from his insurance policy. Defendant told Loftis she would get $200,000 if Wayne was killed. When Loftis told defendant that he did know someone, defendant gave him $400.00 or $500.00 and instructed Loftis that the murder should be made to look like a robbery. Loftis, however, used the money to pay his bills and "party."

Defendant also asked Loftis himself about killing her husband. Additionally, she gave Loftis an assault rifle to sell and use the money to hire someone to kill her husband. In October 1998, Loftis was sent to prison, where he remained until late December 1998. When defendant learned that Loftis was out of prison, she began looking for him by contacting his friends and family members.

Also on 25 March 1999, Special Agent David Hedgecock of the North Carolina State Bureau of Investigation (SBI) interviewed Loftis' girlfriend, Dori Gwynn. Gwynn corroborated Loftis' earlier statements and told police that defendant had offered Gwynn and Loftis $5,000 if they would kill defendant's husband.

Following his interview with Gwynn, Agent Hedgecock interviewed defendant at the Rockingham County Sheriff's Department at 7:50 p.m. Hedgecock advised defendant that she was not under arrest and could terminate the interview at any time. Defendant told Hedgecock that she understood she was free to leave at any time.

Defendant began the interview by describing the events on the night her husband was killed, reiterating her earlier statement to police. The conversation then shifted to a discussion of defendant's marriage. Defendant told Agent Hedgecock that Wayne had hit her only three times during the marriage but had pushed her and verbally abused her as well. According to defendant, Wayne would get drunk and force her to have sex with him.

Agent Hedgecock asked defendant about her involvement with Jerry Loftis. Defendant acknowledged her sexual relationship with

Loftis but denied that Loftis had anything to do with Wayne's death. Defendant then became visibly upset and began to cry. She told Hedgecock that the person who shot Wayne was a black male named "Antone" but that she did not know his last name.

Defendant admitted to approaching Loftis about getting Wayne killed. Loftis told her he knew someone who would kill Wayne for $1,500. Defendant gave Loftis various amounts of money on several occasions, ultimately totaling $1,500. She raised $300.00 more because Loftis said he needed money to buy a gun. Defendant had no knowledge that Loftis ever tried to find someone to kill Wayne. Upon learning that Loftis was out of jail, defendant began looking for Loftis to get her money back. She thought Antone might know where Loftis was. Accordingly, she met with Antone and told him that she had given Loftis money to have Wayne killed and that Loftis had never done anything about it. Antone told defendant that he would find someone to kill Wayne.

Sometime in March 1999, defendant, bruised from a beating Wayne had given her, went to Antone's residence. Upon seeing the bruises, Antone became upset and told defendant to give him money to buy a gun and he would "handle it." Defendant gave Antone $150.00 on 22 March 1999 to pay for a gun.

Defendant and Antone agreed that Antone would kill Wayne the following evening, 23 March 1999, while defendant attended a candle party. Antone did not kill Wayne as planned but told defendant on 24 March 1999 that he would kill Wayne that night.

At around 5:45 p.m. on 24 March 1999, defendant paged Antone and told him she would be leaving work in about fifteen minutes. Defendant left work as planned and picked up Antone. Defendant dropped Antone off near a pawnshop and went to a tanning salon. After her tanning appointment, defendant drove to the Texaco station on Harrison Street in Reidsville, where she and Antone had planned to meet. Defendant dropped Antone off at a business near her house at 7:10 p.m. before driving home.

After a brief conversation with her husband, defendant began doing laundry. A short time later, the doorbell rang, and defendant answered it to find Antone standing there. Defendant told Antone, "No, this ain't going to work." Antone, however, continued to follow the plan and asked to use the phone because his car had broken down. Defendant told investigators that the rest of the events were

the same as she had initially described. The primary differences were: she admitted (1) that she knew the previously unidentified black male; (2) that she was involved in the events leading up to her husband's shooting; and (3) that after the shooting, she knelt beside Wayne's body and told him, "I'm sorry." Defendant, crying, told the investigators, "I can't believe I did it." Defendant told the investigators that she did not know that Antone was going to rob Wayne and that she had not spoken with Antone since the shooting.

During the interview, Agent Hedgecock asked defendant several times if she needed to use the bathroom or wanted anything to drink. Defendant was offered several breaks but declined. Defendant's interview concluded at 10:00 p.m.

Following the interview, defendant remained at the police station, and at 5:31 a.m. on 26 March 1999, Agent Hedgecock met with defendant again. Hedgecock informed defendant that she was under arrest for the murder of her husband and advised her of her rights. Defendant later led police to a residence where they could find Antone, who was subsequently identified as William Antone Johnson.

## PRE-TRIAL ISSUE

[1] In her first assignment of error, defendant contends that the trial court erred in denying her motion to suppress the statement given to SBI special agents on 25 March 1999. Defendant argues the conditions of the interview constituted a restraint on her freedom of movement to the degree associated with formal arrest. Defendant additionally argues the trial court erred in admitting her 26 March 1999 statement as the product of the 25 March 1999 statement.

First, defendant argues her 25 March 1999 statement to SBI agents was given while she was in custody and should therefore have been suppressed because she was not given *Miranda* warnings. Defendant did not testify at the suppression hearing but presented an affidavit in support of her motion. Defendant alleged that the interviewer physically touched her with his hand and knees and otherwise crowded her. Defendant further alleged that she was denied permission to talk to her father and believed she was unable to freely leave.

At the suppression hearing, the State presented the testimony of SBI Special Agent David Hedgecock. Agent Hedgecock testified that he and Agent Peters began their interview of defendant at 7:50 p.m. on 25 March 1999 in a small interview room at the Rockingham

County Sheriff's Department. Agent Peters sat behind a desk taking notes, while Hedgecock and defendant sat face-to-face in chairs in front of the desk. Agent Hedgecock began the interview by informing defendant that she was not under arrest, was free to terminate the interview at any point, and could leave the Sheriff's Department at any time she wished. Defendant told Agent Hedgecock that she understood. The interview room was not large. At some point during the interview, Agent Hedgecock's knees touched defendant's knees and he placed a hand on her shoulder to comfort her.

Agent Hedgecock further testified that he asked defendant several times if she wanted anything to drink or needed to use the bathroom. Defendant declined to take any breaks during the interview. The interview lasted a little over two hours and concluded at 10:00 p.m. At the end of the interview, Agent Hedgecock asked defendant if she would like to be with her father, who had accompanied her to the station for the interview. Defendant declined, whereupon Agents Hedgecock and Peters left the room to consult with other officers. Defendant was not placed under arrest at this time, nor was a deputy assigned to stand guard over her. Agent Hedgecock later observed defendant smoking a cigarette while standing with her father in another part of the building, again not guarded by a deputy. Defendant was not formally placed under arrest until 5:31 a.m. on 26 March 1999, at which time she was advised of her *Miranda* rights. The trial court concluded as a matter of law that "defendant was not in custody at the time the defendant made an oral confession to the agents implicating her in the conspiracy and murder of her husband."

Whether an interrogation is conducted while a person is in custody requires the trial court to reach a conclusion of law, which is fully reviewable by this Court. *State v. Greene*, 332 N.C. 565, 577, 422 S.E.2d 730, 737 (1992). " '[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found.' " *State v. Golphin*, 352 N.C. 364, 409, 533 S.E.2d 168, 201 (2000) (quoting *State v. Fernandez*, 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997)), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001).

In determining whether an individual is in custody, this Court decides, based on the totality of circumstances, whether there was a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719 (1977), *quoted in State v. Hoyle*, 325 N.C.

232, 241, 382 S.E.2d 752, 756 (1989); *see also State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405 ("[T]he definitive inquiry is whether there was a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest."), *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). In the present case, defendant was advised before the interview began that she was not under arrest and could leave at any time. At the time these instructions were given to her, defendant, by her own admission, understood them. At no time during the interview was defendant restrained in her freedom of movement. She had ample opportunity to interrupt the interview to get something to eat or drink, or to use the bathroom, but declined to do so. Moreover, at the conclusion of the interview, defendant was not guarded by law enforcement officers but instead was allowed to move freely throughout the Sheriff's Department. We therefore find no error in the trial court's conclusion that defendant was not in custody at the time of her oral statement to investigators on 25 March 1999.

**[2]** Defendant also argues that the handwritten statement resulting from the interview contemporaneous with her arrest on 26 March 1999 should have been suppressed along with the 25 March 1999 statement, because it was simply another version of the 25 March 1999 statement that defendant contends should have been suppressed. We agree that this statement was a mere reduction to writing by Agent Hedgecock of defendant's earlier statement, with a few minor modifications. However, because we have determined that the 25 March 1999 statement was properly admitted, we similarly conclude the handwritten statement was admissible.

Defendant additionally contends that the handwritten statement was involuntary. Defendant concedes that the trial court found as fact in the suppression hearing that defendant never indicated that she was tired or under duress, never refused to answer any of Agent Hedgecock's questions, and never requested a lawyer. Nonetheless, defendant asserts that the trial court's findings were incomplete because they contained no findings as to: (1) the length of time defendant had been without sleep, (2) the length of time she had been either waiting or under interrogation at the Sheriff's Department, and (3) her experience with the criminal justice system. Defendant further notes that the trial court failed to explicitly conclude that the statement was voluntary.

A trial court's conclusion regarding the voluntariness of a defendant's statement is fully reviewable on appeal. *State v. Hardy*, 339 N.C.

207, 222, 451 S.E.2d 600, 608 (1994). Upon review, this Court considers the totality of the circumstances. *Id.* The defendant's familiarity with the criminal justice system, length of interrogation, and amount of time without sleep are merely a few of many factors to be considered. *Id.* Other considerations include whether defendant was in custody, whether her *Miranda* rights were violated, whether she was held incommunicado, whether there were threats of violence, whether promises were made to obtain the confession, the age and mental condition of defendant, and whether defendant had been deprived of food. *State v. Hyde,* 352 N.C. 37, 45, 530 S.E.2d 281, 288 (2000), *cert. denied,* 531 U.S. 1114, 148 L. Ed. 2d 775 (2001); *State v. Patterson,* 146 N.C. App. 113, 123, 552 S.E.2d 246, 254, *disc. rev. denied,* 354 N.C. 578, 559 S.E.2d 548 (2001). The presence or absence of any one of these factors is not determinative. *State v. Barlow,* 330 N.C. 133, 141, 409 S.E.2d 906, 911 (1991).

In the present case, the totality of the circumstances clearly demonstrates that the handwritten statement was made voluntarily. Defendant was advised of her *Miranda* rights and chose to waive them. At no point in time was defendant threatened or coerced. Defendant never indicated that she was tired or wished to terminate the interview, nor did she request the assistance of counsel. Although she remained at the Sheriff's Department following the conclusion of her confession, defendant was never interrogated further. Indeed, the record reveals she had no contact with investigators from the conclusion of her interview at 10:00 p.m. until the time she was arrested at 5:31 a.m. the next day.

We further note that while the trial court did not explicitly find that the handwritten statement was made voluntarily, the court did find that defendant "freely, knowingly, and voluntarily waived" her *Miranda* rights. The trial court further found that defendant's handwritten statement, made after the *Miranda* warnings, "[did] not violate her constitutional right of the United States []or the North Carolina constitution." We conclude that the trial court properly found that defendant's handwritten statement was voluntary.

In the alternative, defendant contends that if the handwritten statement made on 26 March 1999 was properly admitted, the admission of her earlier statement on 25 March 1999 was prejudicial. Defendant alleges that subtle differences in the two statements affected the jury's specific findings, as well as their overall impression of defendant. As her only example, defendant points to statements concerning spousal abuse. Defendant notes that the 25

March 1999 statement revealed that Wayne had hit defendant only three times during their marriage. The 26 March 1999 statement reads: "[M]y present husband Wayne Kemmerlin was also physically, verbally, and sometimes sexually abusive to me. He sometimes pushed me, or hit me in the face, and often made me have sex with him when he was drunk." According to defendant, if even one juror had believed her contention that spousal abuse, not pecuniary gain, motivated the killing, she would not have received a death sentence.

We note that the trial court admitted into evidence both the 25 March and the 26 March statements. Additionally, defendant testified at the sentencing proceeding in greater detail concerning the alleged physical and sexual abuse. The jurors were given several opportunities to hear evidence concerning spousal abuse and were able to make their own conclusions based on all of the evidence. We fail to see how defendant suffered any prejudice on this issue.

This assignment of error is overruled.

## JURY SELECTION

[3] By assignment of error, defendant argues that the trial court erred in preventing defendant from exploring whether a prospective juror could consider a life sentence for premeditated murder given her personal knowledge of early release from life sentences for murder. Defendant contends that she was unable to adequately inquire into a potential bias from the juror's prior associations with two murders in which the defendants were released early. Defendant further argues that the trial court's refusal to allow her to question the prospective juror and to clarify the law deprived all prospective jurors of relevant and essential information necessary for a reliable sentencing determination, thereby creating risk of the arbitrary and capricious imposition of the death penalty. We find no error in the trial court's actions.

During *voir dire*, prospective juror Crystal Scales related prior associations with two separate murders in which the defendant was released after serving only a few years. Prospective juror Scales informed the court that her aunt had been murdered by the aunt's husband, who served only a few years in jail. Scales told the court that she did not believe the husband should have received the death penalty but "was in shock when he got out so soon." In addition, when prospective juror Scales was a teenager, a close friend was murdered. Scales informed the court that she felt at the time that the

murderer should have received the death penalty, but the murderer instead served less than five years.

Defendant attempted to ask prospective juror Scales if she understood what life imprisonment without the possibility of parole meant but was overruled by the trial court. Scales was ultimately passed by all counsel and sat on the jury. Defendant now contends that prospective juror Scales was not adequately examined by the trial court as to her ability to be an impartial juror in this case.

Trial judges are permitted broad discretion in regulating jury *voir dire*. *State v. Artis*, 325 N.C. 278, 295, 384 S.E.2d 470, 479 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990); *State v. Johnson*, 317 N.C. 343, 382, 346 S.E.2d 596, 618 (1986). To demonstrate reversible error, a defendant must show that the court abused its discretion in regulating jury selection and that the defendant was prejudiced thereby. *State v. Soyars*, 332 N.C. 47, 56, 418 S.E.2d 480, 486 (1992).

During *voir dire*, "the subject of parole eligibility and the meaning of 'life imprisonment' are irrelevant to the issues to be determined during the sentencing proceeding." *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 559, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994); *see also State v. McNeil*, 324 N.C. 33, 44, 375 S.E.2d 909, 916 (1989), *sentence vacated on other grounds*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990). Accordingly, we have found no abuse of discretion where trial courts refuse to allow defendants to question prospective jurors concerning misconceptions about parole. *Lee*, 335 N.C. at 268, 439 S.E.2d at 559; *McNeil*, 324 N.C. at 44, 375 S.E.2d at 916.

As was the case in *Lee* and *McNeil*, we find no abuse of discretion here in the trial court's refusal to allow defendant to question prospective juror Scales. The trial court verified that all prospective jurors, including Scales, could and would impartially consider the evidence regarding mitigating and aggravating circumstances. Additionally, defendant was allowed to ask the prospective jurors if they understood "that some first-degree murders don't deserve the death penalty." Prospective juror Scales also informed the court that (1) she understood that not all first-degree murders merit death, (2) she did not feel that her prior associations with murder would affect her ability to be fair and impartial in defendant's case, and (3) she would not automatically vote for the death penalty upon conviction.

Finally, during the penalty phase, the judge instructed the jury, of which Scales was a member, that upon a recommendation of a sen-

tence of life imprisonment, "the Court [would] impose a sentence of life imprisonment without parole." This instruction sufficiently cures any potential misconception regarding life imprisonment held by prospective juror Scales. Similarly, the trial court's instruction also corrected any perceived prejudicial impression in the minds of other jurors who heard prospective juror Scales' comments during *voir dire*. These instructions advised all jurors that life imprisonment without parole was an acceptable punishment for some first-degree murders and did not carry any opportunity for parole or early release.

This assignment of error is overruled.

[4] In her next assignment of error, defendant argues the trial court erred in excusing for cause prospective jurors Connie Williams, Mark Young, and Janet New on the grounds that each would be unable to return a sentence of death. Defendant further assigns error to the trial court's denial of defendant's request to rehabilitate prospective jurors Williams and Young.

The proper standard for determining whether a prospective juror can be excluded for cause because of the juror's views on capital punishment is whether those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 420, 83 L. Ed. 2d 841, 849 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)) (emphasis omitted); *see also State v. Gregory*, 340 N.C. 365, 394, 459 S.E.2d 638, 654 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996); *State v. Syriani*, 333 N.C. 350, 369, 428 S.E.2d 118, 128, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Challenge for cause must be based on more than the prospective juror's " 'general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' " *Gregory*, 340 N.C. at 394, 459 S.E.2d at 654 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85 (1968)).

However, "a prospective juror's bias for or against the death penalty cannot always be proven with unmistakable clarity." *State v. Miller*, 339 N.C. 663, 679, 455 S.E.2d 137, 145, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995). "[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Wainwright*, 469 U.S. at 425-26, 83 L. Ed. 2d at 852. Consequently, we ordinarily "defer to the trial court's judgment as to whether the

prospective juror could impartially follow the law." *State v. Morganherring*, 350 N.C. 701, 726, 517 S.E.2d 622, 637 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000). "The trial court's decision to excuse a juror is discretionary and will not be disturbed absent an abuse of discretion." *State v. Blakeney*, 352 N.C. 287, 299, 531 S.E.2d 799, 810 (2000), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001).

Additionally, trial courts should be accorded great deference in their refusal to permit rehabilitation of a prospective juror. *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). "[A] defendant may not 'rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the [sentencing] court.' " *State v. Smith*, 352 N.C. 531, 545, 532 S.E.2d 773, 783 (2000) (quoting *Cummings*, 326 N.C. at 307, 389 S.E.2d at 71), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001).

In the present case, the prosecutor questioned prospective juror Williams as follows:

Q. Miss Williams, you indicated you had beliefs regarding the death penalty one way or the other?

A. I don't feel that I could honestly put somebody to death.

Q. How long have you held that belief?

A. I've always felt that way.

Q. On account of those beliefs and feelings, would you return a sentence of death even though the State proved things required of it beyond a reasonable doubt?

A. If it was beyond a reasonable doubt, then I probably could, but it would have to be very—

Q. You understand, Ma'am, that in any criminal case that the State is prosecuting that our burden of proof is beyond a reasonable doubt?

A. Right.

. . . .

Q. Now, are you saying that you would hold the State to a higher burden of proof which is the law of this state, beyond a reasonable doubt, because this is a death penalty case?

A. I would hate to make that judgment is what I'm saying in regard[] to a person. I could not make that judgment in regard[] to a living person.

Q. With regard to the imposition of the death penalty?

A. Right.

Q. Would your views on the death penalty prevent or substantially impair the performance of your duties as a juror in accordance with the instructions given by the Court and your oath?

A. No.

Q. They would not?

A. Right.

Q. So, you would if the State proved what is required beyond a reasonable doubt, you'd be able to impose the death penalty?

A. If you proved it beyond a reasonable doubt.

. . . .

Q. And would you hold the State to a higher burden as to erase all doubt in your mind?

A. I'd have to have it all erased.

At this point, the prosecutor asked to excuse Williams for cause, and both the court and the prosecutor questioned her further:

THE COURT: Let me ask you, Miss Williams, if you have your own definition of what reasonable doubt is and then you heard the Court's definition of reasonable doubt. Would you set aside what your feelings are and what your definition is and follow the Court's instructions?

MISS WILLIAMS: Well, yes, I could do that.

. . . .

Q. Now, you have your own views on the death penalty?

A. Yes, sir.

Q. And what are those views?

A. I believe in the death penalty. I feel like I'm contradicting myself. I do believe in the death penalty. I do feel like if you com-

mitted a crime and you were sentenced to that, I agree that there should be that type of punishment. I'm just saying for me to sit on a jury as a juror and decide whether somebody lived or died, I could not do that myself.

Q. So, would it be fair to say that because of your feelings on the death penalty, regardless of the circumstances the State might prove to you, you would not vote in favor of the death penalty?

A. I could not.

. . . .

Q. And would your views of the death penalty prevent or sub-stantially impair the performance of your duties as a juror in accordance with the instructions and your oath?

A. Yes, I guess it would.

[PROSECUTOR]: I offer her for cause.

THE COURT: I'm going to ask you one more question. If it came time to pronounce the verdict that the defendant was to receive the death penalty, if it came to that point and you had to stand up by yourself with all the other jurors sitting there, could you say the defendant is to receive a sentence of death?

MISS WILLIAMS: I could not do that.

Similarly, prospective juror Young was questioned by the prose-cutor as follows, following an explanation of sentencing laws:

Q. Now knowing that, do you have any religious or moral objec-tions against the death penalty?

A. Well, I agree it's not right to kill someone. I'm not sure I agree that it's any better for us to kill.

. . . .

Q. Would your views impede or hinder your ability to return a verdict of death?

A. It's a possibility.

Q. It's a possibility?

A. Uh-huh.

**STATE v. KEMMERLIN**

[356 N.C. 446 (2002)]

Q. Are you saying that no matter what the evidence or no matter what the circumstances present in this particular case that you would not be able to return a verdict of death if that were required under the law and the evidence that we presented?

A. It would be a difficult one.

Q. Could you do it?

A. I really don't know that.

Q. Do you think you'd have the strength to come into the courtroom if there was a unanimous decision of the jury that this defendant be sentenced to death and the other eleven are still sitting, as you are now, that you could stand up and say that she should be sentenced to death by yourself?

A. I don't think I could if it was required of me.

Q. It wouldn't be your decision only. Don't misunderstand. Everyone else would have to stand up, but individually we'd have to go down the row. Could you do that?

A. I don't think, at this point, I don't think I could.

. . . .

Q. Would you have to hear the evidence and the facts in the case before you could make a decision on that?

A. I just don't think that I would feel right with myself if I did personally.

. . . .

Q. Would your views on the death penalty that you stated a moment ago—I don't want to put words in your mouth.—prevent or impair the duties of your performance as a juror in accordance with the instructions as given to you by his Honor and the oath as a juror?

A. I think it would impair.

Prospective juror Young was then offered for cause, and the court inquired of him further as follows:

THE COURT: I'm going to go back. Let me ask you this: Are you saying that if you're required to sit as a juror in this case and if the juror is required to make a sentence recommendation, that

**STATE v. KEMMERLIN**

[356 N.C. 446 (2002)]

you have because of your personal beliefs against the death penalty, that you've already made up your mind to vote for life without parole and against the death penalty no matter what the evidence showed?

MR. YOUNG: (No reply).

THE COURT: There is no right or wrong answer.

MR. YOUNG: Yeah. I think yeah. I think that's true.

THE COURT: Okay, Let. me ask you this: I take it, then, that due to your personal, moral, or religious beliefs that there are no circumstances under which you as a juror could ever consider voting in favor of a sentence of death?

MR. YOUNG: I would say so.

THE COURT: Is that a yes?

MR. YOUNG: Yes. Yes.

THE COURT: So, then is your view in opposition to the death penalty such that it would prevent or substantially impair your ability to perform your sworn duties as a juror?

MR. YOUNG: Yes, sir.

Finally, defendant argues prospective juror New should not have been excused for cause. New was questioned in part as follows:

[PROSECUTOR]: And would you automatically vote against the sentence of death without any regard to any evidence that developed at trial?

MISS NEW: I would not automatically do that, but it would be very hard for me to do that. I would not automatically do it. Like I said, I would do my duty. I would try to look at it as objectively as possible.

. . . .

[PROSECUTOR]: And if the defendant is convicted of first-degree murder, would you be able to consider as his Honor instructs you the death penalty under our law?

MISS NEW: I would be able to consider it.

[PROSECUTOR]: Would you be able to consider, as his Honor instructs you, life imprisonment without parole under our law?

MISS NEW: Yes.

[PROSECUTOR]: And would you automatically vote for a sentence of life imprisonment without parole?

MISS NEW: I would be inclined toward life . . . .

Following the prosecutor's first motion for cause, New was questioned further by both the trial court and defense counsel:

THE COURT: Let me ask you this: Could you set aside whatever your personal beliefs are against it and follow the law as given you by the Court, listen to the arguments of counsel, and then listen to the evidence and make your decision based on that?

MISS NEW: I would attempt to. To say that my personal beliefs would not filter in it, I'm saying that that would not happen, but I would try.

. . . .

. . . I mean, I feel the death penalty is wrong, but all I can do is try to consider it. I mean, I feel it's wrong, but I'll try to do what I'm supposed to do.

THE COURT: Yes, ma'am.

[DEFENSE COUNSEL]: If the jury were to unanimously find that the defendant was guilty of first-degree murder, you understand, then you would go to a second phase?

MISS NEW: Right.

[DEFENSE COUNSEL]: And after hearing certain evidence and hearing the law that the Judge tells you, he'll instruct you as to what the law is concerning capital punishment versus life imprisonment without parole. Um, do you believe that, that first the jury having found the defendant unanimously guilty, guilty of first-degree murder, if they do that, then going to the sentencing phase and listening to evidence and listening to the judge's instructions, would you automatically vote against the death penalty simply

because of your belief in opposition to the death penalty? And, remember, there is no right or wrong answer.

MISS NEW: I mean, I haven't heard this situation on this case. I would be inclined to vote against the death penalty. I just don't know.

. . . .

. . . I don't think I could put my personal feelings aside. I could try. I think it's a very personal decision. I mean it's a very personal decision to make about somebody and their life.

Ultimately, the trial court excused prospective juror New for cause with the following comments:

THE COURT: . . . This juror is excused. That as a reason of conscience, regardless of the facts and circumstances, she'll be unable to render a verdict with respect to the charge in accordance with 15A-1212(b).

Further her views concerning the death penalty would prevent or substantially impair her duty in the performance of a juror in accordance with the juror's oath.

Once prospective juror New was dismissed, the trial court made the following additional comments:

THE COURT: . . . Just for the record, the Court will note that the Court observed the demeanor and responses to both the State's inquiry, the Court's inquiry, and the defendant's inquiry, that the juror Miss New appeared to be emotional. I also inquired on the responses and could not tell from the Court's questions or State['s] and defendant's questions, but she appeared that maybe [we] believed that she was lying and I told her that that was not the case.

In light of that, her answers, that although her answers appeared to be equivocal, and ambiguous, the Court determined that she would be excused for cause based on her views against the death penalty and notes the objection and exception on the record and excused the juror in accordance with the Court's findings.

Defendant contends that prospective jurors Williams and Young gave ambiguous or conflicting responses that should have been clarified prior to the prospective jurors' excusals. Defendant also

asserts that the prosecutor's and the trial court's questioning was insufficient to determine whether the jurors were qualified and asserts that defense counsel was entitled to further questioning. With regard to prospective juror New, defendant contends that the trial court incorrectly found she was unable to return a verdict of death given her views, as defendant contends that New gave acceptable answers to the death-qualification questions. Defendant therefore contends that the excusal of prospective jurors Williams, Young, and New violated defendant's constitutional right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution.

With regard to prospective jurors Williams and Young, we note that "[a] prospective juror is properly excused for cause when his answers on *voir dire* concerning his attitudes toward the death penalty, although equivocal, show when considered contextually that regardless of the evidence he would not vote to convict the defendant if conviction meant the imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 324, 259 S.E.2d 510, 526 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980); *see also State v. Simmons*, 286 N.C. 681, 688-89, 213 S.E.2d 280, 286 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976); *State v. Avery*, 286 N.C. 459, 464, 212 S.E.2d 142, 149 (1975), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1209 (1976). Although prospective jurors Williams and Young were both initially somewhat hesitant to express their views on capital punishment, ultimately both prospective jurors explicitly told the court that their views on the death penalty would prevent or substantially impair the performance of their duties as a juror. *See Wainwright*, 469 U.S. at 420, 83 L. Ed. 2d at 849. Prospective juror Williams stated that she could not vote for the death penalty, as it would violate her personal views on the death penalty. Likewise, prospective juror Young told the court that there were no circumstances under which he could ever consider voting in favor of a sentence of death. These statements represent an unmistakable commitment to automatically vote against the death penalty, regardless of the facts and circumstances which might be presented. *Witherspoon*, 391 U.S. at 522 n.21, 20 L. Ed. 2d at 785 n.21. Accordingly, the trial court properly excused prospective jurors Williams and Young and denied defendant's requests to rehabilitate them.

With regard to prospective juror New, we note that New never explicitly stated that her views regarding the death penalty would "prevent or substantially impair the performance of [her] duties as a

juror." *Wainwright,* 469 U.S. at 420, 83 L. Ed. 2d at 849. Nonetheless, prospective juror New consistently stated that she was inclined to vote for life imprisonment without parole. New indicated to the court that she would try to consider imposition of the death penalty but admitted that her personal beliefs might affect her decision. We again reiterate our deference to a trial court's judgment regarding a prospective juror's impartiality, as the trial court is able to observe a prospective juror's demeanor and behavior. *Id.* at 425-26, 83 L. Ed. 2d at 852-53; *Morganherring,* 350 N.C. at 726, 517 S.E.2d at 637. Based on its own observations, the trial court found that prospective juror New was emotional and believed that the court felt she was lying. Given the court's observations of prospective juror New, her clear inclination against the death penalty, and her uncertainty as to her ability to refrain from allowing her personal views to affect her responsibilities as a juror, we conclude that the trial court properly excused prospective juror New for cause.

This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[5] In her next assignment of error, defendant contends the trial court erred in failing to intervene *ex mero motu* to prohibit the prosecutor's statements during closing arguments that the jury would not have heard defendant's confession unless the trial court had determined it was properly taken and reliable. We disagree.

In capital cases, counsel is permitted wide latitude in arguing to the jury and may argue facts in evidence and all reasonable inferences therefrom. *State v. Sanderson,* 336 N.C. 1, 15, 442 S.E.2d 33, 42 (1994). The control of jury arguments is within the discretion of the trial court and will not be reversed unless the remarks are "clearly calculated to prejudice the jury in its deliberations." *State v. Johnson,* 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). The Court in *Johnson* also noted

the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*Id.*

In the present case, the prosecutor argued in his closing as follows:

STATE v. KEMMERLIN

[356 N.C. 446 (2002)]

Now, in moving to her statement, before I say one thing about her statement, I'll say this: I'll argue and contend to you that if there were anything, one thing wrong with the way that statement was taken or the contents of that statement, you would have heard it. You wouldn't have heard that statement. Nothing's wrong with that statement. If there was something wrong with the statement or the way it was taken, you would not have heard it. It would never have gotten before you. There was nothing wrong with it. Nothing.

Defendant contends this argument is analogous to the prosecutor's argument in *State v. Allen*, in which this Court held that the prosecutor's statements during closing arguments violated N.C.G.S. § 15A-1230(a) because they placed prejudicial matters before the jury. *See State v. Allen*, 353 N.C. 504, 511, 546 S.E.2d 372, 376 (2001); *see also* N.C.G.S. § 15A-1230(a) (2001) (providing limitations on closing arguments to a jury). In the instant case, defendant argues that the trial court's failure to intervene had the same effect as if the trial court had explicitly expressed the opinion, thus leaving the jury with the impression that it need not consider defendant's contentions that details in the statement were inaccurate. Defendant further asserts that this impression could have affected the jury's findings regarding premeditation and conspiracy, resulting in a gross impropriety and abuse of discretion that could have affected the jury's determination at the guilt-innocence phase.

Defendant's reliance on *Allen* is misplaced. In *Allen*, the prosecutor stated during his closing arguments as follows:

We told you in the beginning we didn't have an eyewitness, but we do have an eyewitness, we have Maria Santos. She's an eyewitness in this case and she spoke through you—to you through the words of Rafael Barros who talked to her that night. She described what she saw, how many people entered her house. And you heard her words through Officer Barros, because the Court let you hear it, because the Court *found* they were *trustworthy and reliable*. . . . If there had been anything wrong with that evidence, you would not have heard that.

*Id.* at 508, 546 S.E.2d at 374 (emphasis added). The prosecutor in *Allen* explicitly informed the jury of the trial court's opinion regarding the trustworthiness and reliability of the admitted statements. *Id.* at 509, 546 S.E.2d at 375. On appeal, this Court determined the statement violated N.C.G.S. § 15A-1222, which forbids the trial court from

" 'express[ing] during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury.' " *Id.* at 510-11, 546 S.E.2d at 375 (quoting N.C.G.S. § 15A-1222 (1999)).

Unlike the prosecutor in *Allen*, the prosecutor in the present case did not indicate to the jury that the trial court had found defendant's statement trustworthy or reliable. No mention was made of any evidentiary findings. The prosecutor simply reminded the jury that no evidence could be presented to them without a determination that it was proper for them to hear. Whether the statement was trustworthy and credible remained a fact for the jury to decide.

*Allen* is also distinguishable from the present case because defense counsel in *Allen* immediately objected to the prosecutor's statements. *See id.* at 508, 546 S.E.2d at 374. By overruling the defendant's objection, the trial court reinforced and ratified the prosecutor's argument. In the present case, defendant made no objection.

Defendant contends that the prosecutor's statements to the jury created extreme prejudice because defendant challenged specific details of her statement to SBI Special Agents Hedgecock and Peters in an attempt to create reasonable doubt. We find no such prejudice. Defendant was allowed to present evidence that the agents omitted portions of her statement and that the statement was taken while defendant was tired and in a coercive environment. The prosecutor never implied that the trial court rejected defendant's attacks on the statement or found the statement somehow lacking. The State merely fulfilled its duty "to strenuously pursue the goal of persuading the jury that the facts of the particular case at hand warrant imposition of the death penalty." *State v. Green*, 336 N.C. 142, 188, 443 S.E.2d 14, 41, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Defendant has failed to show us how the prosecutor's comments infected the trial with unfairness and thus rendered the conviction fundamentally unfair. *See State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 229 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

This assignment of error is overruled.

[6] Defendant next assigns error to the trial court's denial of her motion to dismiss the charge of robbery with a dangerous weapon. Defendant contends that because the State failed to sufficiently prove

the element of intent to deprive, her conviction for armed robbery should be vacated.

When considering a motion to dismiss, the trial court must determine whether "there is substantial evidence of each essential element of the crime." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). We have defined substantial evidence as that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion. *State v. Frogge*, 351 N.C. 576, 584, 528 S.E.2d 893, 899, *cert. denied*, 531 U.S. 994, 148 L. Ed. 2d 459 (2000). In ruling on a motion to dismiss, the trial court is required to view the evidence in the light most favorable to the State, making all reasonable inferences from the evidence in favor of the State. *State v. Lucas*, 353 N.C. 568, 581, 548 S.E.2d 712, 721 (2001). Moreover, "[c]ircumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988); *see also Frogge*, 351 N.C. at 585, 528 S.E.2d at 899.

With regard to the charge of robbery with a dangerous weapon, the State was required to prove "(1) an unlawful taking or an attempt to take personal property from the person or in the presence of another, (2) by use or threatened use of a firearm or other dangerous weapon, (3) whereby the life of a person is endangered or threatened." *Call*, 349 N.C. at 417, 508 S.E.2d at 518; *see also* N.C.G.S. § 14-87(a) (2001). The State must also demonstrate that the defendant had the intent to deprive the owner of his property at the time of taking. *State v. Richardson*, 308 N.C. 470, 474, 302 S.E.2d 799, 802 (1983). Intent may be inferred by demonstrating that defendant did not intend to return the property and was indifferent as to whether the owner ever recovered the property. *State v. Smith*, 268 N.C. 167, 172, 150 S.E.2d 194, 200 (1966).

The State's theory in the present case was that defendant acted in concert with Antone Johnson to take her husband's work truck from her residence. Defendant points to the lack of direct evidence regarding Johnson's intentions when he took the truck. Defendant argues instead that because the truck was abandoned in plain view, close to the residence, where it was likely to be found, Johnson lacked the total indifference to the owner's right to recover the truck that would be necessary to support an inference of intent to deprive. Instead, defendant contends that the evidence supports only two intentions: that Johnson took the truck to make the crime scene appear like a robbery and that Johnson used the truck to get away from the crime

scene to a place where he could safely escape. Defendant contends these intentions are insufficient to support a conviction for robbery with a dangerous weapon.

Viewed in the light most favorable to the State, the evidence shows that defendant and Johnson conspired to make the crime scene look like a robbery. Johnson drove off in the victim's truck after killing defendant's husband, abandoning the vehicle three miles from the Kemmerlin residence. Law enforcement officers later recovered the keys to the vehicle in nearby woods.

As defendant concedes in her brief, the intent to permanently deprive need not be established by direct evidence but can be inferred from the surrounding circumstances. *See State v. Barts*, 316 N.C. 666, 690, 343 S.E.2d 828, 843-44 (1986). We have also noted that the abandonment of a vehicle, regardless of how near the abandonment is to the scene of the crime, places it "beyond [a defendant's] power to return the property and shows a total indifference as to whether the owner ever recovers it." *Id.*; *see also State v. Mann*, 355 N.C. 294, 304, 560 S.E.2d 776, 783 (holding that where a defendant abandoned a vehicle in a subdivision near where the victim's body was found, there was sufficient evidence of intent to permanently deprive the owner of the vehicle), *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (Nov. 4, 2002) (No. 02-6059). Here, the evidence that Johnson took the vehicle and subsequently abandoned it near the crime scene was sufficient to show an intent to permanently deprive the victim of his property. Accordingly, we hold that the trial court did not err in denying defendant's motion to dismiss the robbery charge.

This assignment of error is overruled.

[7] In another assignment of error, defendant contends the trial court erred in failing to vacate the convictions of solicitation to commit murder and conspiracy to commit murder. Defendant asserts that both convictions merge with the conviction for first-degree murder by acting in concert and that punishment for both crimes violates double jeopardy. We hold that the crimes do not merge with the first-degree murder conviction.

The Double Jeopardy Clauses of both the United States Constitution and the North Carolina Constitution prohibit multiple punishment for the same offense. *State v. Gardner*, 315 N.C. 444, 451, 340 S.E.2d 701, 707 (1986); *see also* U.S. Const. amend. V; N.C. Const.

art. I, § 19. North Carolina has adopted a definitional test for determining whether a crime is in fact a lesser offense that merges with the greater offense. *State v. Weaver*, 306 N.C. 629, 635, 295 S.E.2d 375, 378-79 (1982), *overruled on other grounds by State v. Collins*, 334 N.C. 54, 61, 431 S.E.2d 188, 193 (1993); *State v. Westbrooks*, 345 N.C. 43, 56, 478 S.E.2d 483, 491 (1996). "[A]ll of the essential elements of the lesser crime must also be essential elements included in the greater crime. If the lesser crime has an essential element which is not completely covered by the greater crime, it is not a lesser included offense." *Weaver*, 306 N.C. at 635, 295 S.E.2d at 379.

We have previously defined the crime of solicitation as "counseling, enticing or inducing another to commit a crime." *State v. Furr*, 292 N.C. 711, 720, 235 S.E.2d 193, 199, *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977). Acting in concert, as applied to first-degree murder, requires "two persons join[ed] in a purpose to commit [murder]," where both persons are "actually or constructively present." *State v. Westbrook*, 279 N.C. 18, 41, 181 S.E.2d 572, 586 (1971), *death sentence vacated*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972). Under this theory, each person "is not only guilty as a principal if the other commits [murder], but he is also guilty of any other crime committed by the other in pursuance of the common purpose." *Id.*

Defendant cites *State v. Westbrooks*, in which we held that solicitation to commit murder is a lesser included offense of first-degree murder as an accessory before the fact. *Westbrooks*, 345 N.C. at 56-57, 478 S.E.2d at 491. Defendant acknowledges that our legislature has since abolished the distinction between first-degree murder as an accessory before the fact and first-degree murder as a principal. *See* N.C.G.S. § 14-5.2 (2001) ("All distinctions between accessories before the fact and principals to the commission of a felony are abolished. Every person who heretofore would have been guilty as an accessory before the fact to any felony shall be guilty and punishable as a principal to that felony."). Nonetheless, defendant contends that solicitation, accessory before the fact to murder, and acting in concert to commit murder are essentially a continuum of defendant's involvement in the murder, as all three involve defendant's enticing another to commit the murder. Because we have previously determined that solicitation merges into accessory before the fact, defendant contends we must also conclude that a conviction for solicitation may under some circumstances merge into a conviction for murder based upon a theory of acting in concert. Defendant asserts that because

her role in the present murder was minimal, the conviction for solicitation should be considered a lesser offense of murder by acting in concert.

We find no merit in defendant's argument, as defendant is asking us to use a factual rather than a definitional approach to whether her convictions merge, an approach we rejected in *Westbrooks*, 345 N.C. at 56, 478 S.E.2d at 491. The crime of solicitation requires counseling, enticing, or inducing another to commit a crime. *Furr*, 292 N.C. at 720, 235 S.E.2d at 199. This element is not required for acting in concert. Indeed, acting in concert requires actual or constructive presence at the crime, an element not present in the definition of solicitation. *Westbrook*, 279 N.C. at 41, 181 S.E.2d at 586. Because the crime of solicitation requires the element of enticement, an element not required for murder under a theory of acting in concert, we hold that solicitation is not a lesser included offense of murder by acting in concert. *Weaver*, 306 N.C. at 635, 295 S.E.2d at 379.

Defendant also argues that her conviction for conspiracy should merge with her conviction for first-degree murder by acting in concert. Defendant concedes that conspiracy is a separate offense from the completed crime that normally does not merge into the substantive offense. *See State v. Carey*, 285 N.C. 509, 513, 206 S.E.2d 222, 225 (1974). However, defendant contends that her case is analogous to *State v. Lowery*, in which we stated that a codefendant convicted of the substantive offense based solely on his participation in the conspiracy could not be punished for both conspiracy and the separate offense. *State v. Lowery*, 318 N.C. 54, 74, 347 S.E.2d 729, 743 (1986). In the present case, defendant contends the essence of her illegal behavior was in hiring Johnson to kill her husband and in planning and assisting him prior to the commission of the murder. As such, defendant contends she was convicted of murder solely on the basis of her conspiracy to commit murder because her presence at the scene of the murder was incidental and unnecessary.

We find no analogy between defendant's case and that of the codefendant in *Lowery*. We first note that the death sentence for the codefendant in *Lowery* was vacated on the basis of N.C.G.S. § 14-6, which has since been repealed by our legislature. Moreover, the evidence in *Lowery* showed that the codefendant was not present at the actual murder. *Id.* at 74, 347 S.E.2d at 742. The codefendant's murder conviction was predicated solely on his participation in the conspiracy. *Id.* In the present case, defendant was not only present at the scene of the murder (albeit in another room), but she also let

Johnson into her home knowing he was going to kill her husband and brought her husband into the room where he would be killed. We therefore conclude that defendant's presence at the scene of the murder was much more than incidental and unnecessary.

Accordingly, we find no merit in defendant's contention that her conspiracy conviction merged with her conviction for first-degree murder based on a theory of acting in concert. Conspiracy to commit murder requires the defendant to enter into an agreement with another person to commit murder with the intent to carry out the murder. *State v. Woods*, 307 N.C. 213, 219, 297 S.E.2d 574, 578 (1982). Evidence at trial established that defendant hired Johnson to kill her husband and planned and assisted him prior to the commission of the murder. This evidence is sufficient to support a conviction for conspiracy to commit murder. We see no reason to depart from our long-held rule that conspiracy is a separate offense from the substantive offense and as such does not merge into the substantive offense. *See Carey*, 285 N.C. at 513, 206 S.E.2d at 225. The requirement of an agreement, while necessary to sustain a conviction for conspiracy, is not a necessary element for murder by acting in concert, so defendant's conviction for conspiracy to commit murder does not merge into her conviction for murder by acting in concert. *See Weaver*, 306 N.C. at 635, 295 S.E.2d at 379.

This assignment of error is without merit.

## CAPITAL SENTENCING PROCEEDING

Defendant next assigns error to the trial court's failure to instruct the jury on statutory mitigating circumstances she contends were supported by the evidence. Defendant contends that her due process and Eighth Amendment rights against cruel and unusual punishment were violated when the trial court failed to submit the (f)(4) and (f)(6) mitigating circumstances for the jury's consideration.

[8] Defendant first argues that the trial court erred in failing to submit the (f)(4) mitigator. *See* N.C.G.S. § 15A-2000(f)(4) ("The defendant was an accomplice in or accessory to the capital felony committed by another person and [her] participation was relatively minor."). After reviewing the record, we find no error in the trial court's refusal to submit the (f)(4) circumstance.

A trial court must submit any mitigating circumstance that is supported by substantial evidence. *State v. Strickland*, 346 N.C. 443, 463, 488 S.E.2d 194, 206 (1997), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d

757 (1998). However, "defendant bears the burden of producing 'substantial evidence' tending to show the existence of a mitigating circumstance before that circumstance will be submitted to the jury." *State v. Rouse*, 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *cert denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995). "[T]he test for sufficiency of evidence to support submission of a statutory mitigating circumstance is whether a juror could reasonably find that the circumstance exists based on the evidence." *State v. Fletcher*, 348 N.C. 292, 323, 500 S.E.2d 668, 686 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999).

Defendant asserts that in *State v. Roseboro*, 351 N.C. 536, 549, 528 S.E.2d 1, 10, *cert. denied*, 531 U.S. 1019, 148 L. Ed. 2d 498 (2000), this Court recently found the (f)(4) circumstance inapplicable where the defendant is convicted of premeditated and deliberate murder, and requests that we reconsider *Roseboro* in light of *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). However, defendant overstates the holding in *Roseboro*, and we decline to revisit our *Roseboro* decision, which was based on the record in that case where the evidence would not support a finding that defendant was guilty of premeditated and deliberate murder on a theory of aiding and abetting or that defendant was an accomplice in or accessory to a capital felony committed by another person. *Roseboro*, 351 N.C. at 549-50, 528 S.E.2d at 10.

Defendant has not met her burden of producing substantial evidence to warrant submission of the (f)(4) mitigating circumstance. Contrary to defendant's assertions, the evidence recited above does not support this mitigating circumstance and this assignment of error is without merit. *See* N.C.G.S. § 15A-2000(f)(4).

**[9]** Defendant next asserts that the trial court committed prejudicial error by failing to submit to the jury the (f)(6) mitigating circumstance. *See* N.C.G.S. § 15A-2000(f)(6) (2001) ("The capacity of the defendant to appreciate the criminality of [her] conduct or to conform [her] conduct to the requirements of law was impaired."). Even though defendant withdrew her request for the (f)(6) circumstance, the trial court nonetheless reviewed the (f)(6) circumstance and concluded that it was not supported by substantial . evidence. Consequently, the trial court declined to submit the (f)(6) impaired capacity mitigator, although it did allow defendant's request that the (f)(2) circumstance be submitted. *See* N.C.G.S. § 15A-2000(f)(2) ("The

capital felony was committed while under the influence of mental or emotional disturbance.").

With regard to the (f)(2) mitigating circumstance, we have previously stated:

> Defendant's mental and emotional state *at the time of the crime* is the central question presented by the (f)(2) circumstance. *State v. McKoy*, 323 N.C. 1, 28-29, 372 S.E.2d 12, 27 (1988), *sentence vacated on other grounds*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). The use of the word "disturbance" in the (f)(2) circumstance "shows the General Assembly intended something more . . . than mental impairment which is found in another mitigating circumstance." *State v. Spruill*, 320 N.C. 688, 696, 360 S.E.2d 667, 671 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988).

*State v. Geddie*, 345 N.C. 73, 102-03, 478 S.E.2d 146, 161 (1996), *cert. denied*, 522 U.S. 825, 139 L. Ed. 2d 43 (1997). In contrast, regarding the (f)(6) mitigating circumstance, we have held that "this circumstance has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions." *Syriani*, 333 N.C. at 395, 428 S.E.2d at 142-43.

Our review of the entire record reveals that defendant failed to produce substantial evidence of the (f)(6) circumstance. Defendant's expert witness, Dr. John Warren, conducted psychological testing of defendant, examined defendant's mental-health records from the Rockingham County Mental Health Center, reviewed prior psychological evaluations including raw test data, and conducted face-to-face clinical interviews with defendant. Dr. Warren noted that defendant's childhood included sexual abuse and neglect. Dr. Warren also learned that defendant was upset because her stepson, Timmy, was coming to live with her and the victim. Defendant believed Timmy had sexually abused her daughter and was concerned this abuse would happen again. Dr. Warren noted that defendant's history made her "exquisitely and overly attuned to sexual issues in general and sexual abuse issues in particular." With this information, Dr. Warren described defendant's mental state at the time the murder was committed as follows:

> It's my opinion that she was under the influence of two disorders, one being the personality disorder which I diagnose as

borderline personality disorder and the second, the more acute or serious, if you will, disorder of major depressive disorder, and I support those diagnoses on the basis of prior psychological testing, my current testing, prior psychiatric and counsellor's [sic] evaluations, and my evaluations over three visits in a matter of six hours of contact with her.

The following exchange took place between Dr. Warren and the prosecutor upon cross-examination:

Q. Could you explain the borderline personality for the jury?

A. Personality disorders in general are longstanding and pervasive patterns of thinking and behaving that develop[] as a result of childhood trauma or inconsistencies generally, and borderline personality is arguably the more severe of the personality disorders because the nature of the disorder is extreme disruption in parent-child bonding and extreme instability in thinking and behavior as a grown adult would.

Q. Based upon her statement, do you think at the time this murder was committed the defendant was able to appreciate the criminality of her conduct?

A. Yes, I think she was.

Q. Do you think your diagnosis of the defendant would in any way impair the defendant's capacity to perform under the requirements of the law?

A. I think it would impair it somewhat, but not to the point of her being unable to do that.

Q. And based on her statement and your review of the notes and your conversation with her, do you think at the time that she opened that door, that Anton[e] Johnson murdered her husband, that she was under the influence of some type of—Well, do you think that she was affected or influenced by some type of disturbance?

A. By some kind of disturbance?

Q. Yes, sir.

A. In general I do, because I think that major key depression and borderline personality have been documented as occurring before and after the offense. So, I think she suffered from those

disorders, but if I understand your question, it was not to the level of impairing her ability to appreciate the wrongfulness. In other words, I think that her psychiatric disorders do give a context and a bigger picture of this woman, but I don't think and have not testified that it goes to the level of any type of insanity or to her mental capacity.

. . . .

Q. Your testimony earlier was that at the time Mr. Kemmerlin was killed, the defendant was able to appreciate the criminality of her conduct; is that correct?

A. Yes, sir. My evaluation is that she does have these two mental disorders, but they didn't arise to the level of any defense such as insanity or any issues as the inability to, you know, plan and that kind of thing; and also, that her ability to know right from wrong, appreciate wrongfulness and her ability to generally control her behavior while shaky and impaired at times were intact.

Based on this testimony, we conclude the trial court properly refused to submit the (f)(6) mitigator. The evidence shows that defendant was depressed and suffering from borderline personality disorder. Accordingly, defendant was under the influence of a mental or emotional disturbance. However, defendant's own expert testified that this disturbance did not prevent defendant from appreciating the criminality of her conduct and controlling her conduct as required by law. Because defendant offered no other substantial evidence of this circumstance, we hold that the trial court did not err in refusing to submit the (f)(6) mitigating circumstance.

This assignment of error is overruled.

[10] In her next assignment of error, defendant argues that the prosecutor committed misconduct and prejudicial constitutional error in commenting on defendant's exercise of her right to trial by jury and her right not to testify. Defendant contends that the trial court erred by failing to take sufficient action to cure the error.

"A criminal defendant may not be compelled to testify, and any reference by the State regarding [her] failure to testify is violative of [her] constitutional right to remain silent." *State v. Baymon*, 336 N.C. 748, 758, 446 S.E.2d 1, 6 (1994); *see also* U.S. Const. amend. V; N.C. Const. art. I, § 23; N.C.G.S. § 8-54 (2001). Any reference by the prosecutor to a criminal defendant's right not to testify is error. *State v.*

*Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). However, such a comment may be cured by "a withdrawal of the remark or by a statement from the court that it was improper, followed by an instruction to the jury not to consider the failure of the accused to offer himself as a witness." *State v. McCall*, 286 N.C. 472, 487, 212 S.E.2d 132, 141 (1975), *death sentence vacated*, 429 U.S. 912, 50 L. Ed. 2d 278 (1976); *see also Reid*, 334 N.C. at 556, 434 S.E.2d at 197. The trial court's curative instructions to the jury should occur promptly after the comment is made rather than in general jury charges of instruction. *State v. Gregory*, 348 N.C. 203, 210, 499 S.E.2d 753, 758, (holding that prosecutor's direct comments on a defendant's failure to testify were not cured by subsequent inclusion in the jury charge of an instruction regarding the defendant's right not to testify), *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998); *State v. Monk*, 286 N.C. 509, 516-17, 212 S.E.2d 125, 131-32 (1975) (requiring instruction to be "prompt and explicit"). Even if the trial court fails to give a curative instruction, the court still must determine whether the error was harmless beyond a reasonable doubt. *State v. Warren*, 348 N.C. 80, 106, 499 S.E.2d 431, 445, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998).

Similarly, a defendant also has a constitutional right to plead not guilty and is entitled to a jury trial. U.S. Const. amend. VI; N.C. Const. art. I, § 24; *State v. Langford*, 319 N.C. 340, 345, 354 S.E.2d 523, 526 (1987). Consequently, a prosecutor's reference to a defendant's failure to plead guilty is a violation of the defendant's constitutional right to a jury trial. "The court's failure to give a curative instruction after such a reference does not warrant a reversal, however, if the State shows that the error was harmless beyond a reasonable doubt." *State v. Larry*, 345 N.C. 497, 524, 481 S.E.2d 907, 923, *cert. denied*, 522 U.S. 917, 139 L. Ed. 2d 234 (1997); *see also* N.C.G.S. § 15A-1443(b) (2001).

Defendant first complains that the prosecutor improperly questioned her during sentencing. The following portion of the record appears relevant:

Q. Now, you sat here for four weeks, correct, during this trial?

A. Yes, sir.

Q. And you heard the evidence being presented, correct?

A. Yes, sir.

Q. And, and knowing full well that you were guilty, correct?

A. Yes, sir.

STATE v. KEMMERLIN

[356 N.C. 446 (2002)]

Q. Hoping, for some reason, this jury would set you free.

MR. BLITZER [DEFENSE COUNSEL]: Objection, Judge.

THE COURT: That's sustained.

MR. BLITZER: Move to strike. We need to approach, your Honor.

THE COURT: Y'all approach.

(Whereupon there is an off-the-record discussion).

THE COURT: All right. You can continue.

[PROSECUTOR]: Captain Adams, would you please stand.

(Captain Adams stands).

Q. Do you know that man, Ms. Kemmerlin?

A. Yes, I do.

Q. Tell the jury and the Court who he is.

MR. BLITZER [DEFENSE COUNSEL]: Objection.

MR. ETRINGER [DEFENSE COUNSEL]: Objection.

THE COURT: Y'all [the jurors] step out just a minute.

After the jurors left the courtroom, defense counsel requested an instruction regarding defendant's right not to testify and to plead not guilty. The jurors then returned, and the trial court repeated an earlier instruction:

THE COURT: All right, ladies and gentlemen, earlier there may have been some questions asked concerning the length of the trial, and the fact that you heard evidence and whether or not the defendant was guilty which she responded to. That I want to inform you that you cannot consider that in your determination in the sentencing phase.

As I indicated to you at the beginning of the trial, the defendant had entered a plea of not guilty, and under our system of justice, a defendant who pleads not guilty is not required to prove her innocence but is presumed to be innocent, and that's a constitutional right given by the U.S. Constitution and North Carolina Constitution.

Furthermore, that presumption would remain with the defendant throughout the trial unless and until the jury selected to hear the case was convinced from the facts and the law, beyond a reasonable doubt, of the guilt of the defendant.

Furthermore, under our constitution, the burden of proof is on the State to prove to you that the defendant is guilty beyond a reasonable doubt. Furthermore, I also indicated to you the defendant's constitutional right, that there was no burden or duty of any kind on the defendant. If she chose not to testify or offer any evidence, that you could not hold that against her, and that was her right as allowed by our constitution; and the mere fact that she had been charged with a crime is no evidence of guilt and that the charge is merely a mechanical, administrative way by which a person is brought to a trial.

So, therefore, she has a constitutional right not to offer any evidence, and the fact that she chose that route could not be considered by you []or contemplated by you in your deliberations once you begin deliberating for this case.

Defendant contends that the prosecutor's statements violated defendant's due process rights, violated state law, and violated her right to have a capital sentencing determination without the influence of passion or prejudice as guaranteed in N.C.G.S. § 15A-2000(d)(2). Specifically, defendant argues that the trial court's attempt to cure the errors were insufficient because the court gave no immediate statement that the comments were improper. In support of her position, defendant cites the following *dicta* from *State v. Oates*, "[t]o be effective, the trial court's instruction should immediately follow the offensive remark and should explain why the remark was improper." 65 N.C. App. 112, 114, 308 S.E.2d 507, 508 (1983), *disc. rev. denied*, 315 S.E.2d 708 (1984).

In *Oates*, however, the trial court merely instructed the jury to "disregard counsel's statement." *Id.* More importantly, the only instruction provided to the jury was a general instruction during the jury charge on the defendant's right not to testify. *Id.* The court in *Oates* properly concluded that such an instruction was "insufficient to remove the prejudice because no reference was made to the offending argument, and the damage done by it remained unrepaired." *Id.* Viewed in this context, the requirement that the trial court's instruction be immediate simply reflects the well-established

rule that the trial court should instruct the jury shortly after an improper comment is made, rather than via general instructions during the jury charge. *See Gregory*, 348 N.C. at 210-11, 499 S.E.2d at 758; *Reid*, 334 N.C. at 556, 434 S.E.2d at 197. We therefore conclude that the trial court's instruction timely cured any possible prejudice.

Defendant also argues that the instruction given by the trial court was vague in describing defendant's constitutional rights, failed to address her right to a jury trial, addressed only indirectly her right not to testify, and gave an insufficient explanation of why the comments were improper. We reject each of these contentions. We have never required such specificity in the instructions, so long as the trial court states that the comment " 'was improper, followed by an instruction to the jury not to consider the failure of the accused to offer himself as a witness.' " *Reid*, 334 N.C. at 556, 434 S.E.2d at 197 (quoting *McCall*, 286 N.C. at 487, 212 S.E.2d at 141); *see also Monk*, 286 N.C. at 516, 212 S.E.2d at 131 ("Improper comment on defendant's failure to testify may be cured by an instruction from the court that the argument is improper followed by prompt and explicit instructions to the jury to disregard it.") In the present case, the trial court identified the questions that were allegedly improper and told the jury: "If [defendant] chose not to testify or offer any evidence, that you could not hold that against her, and that was her right as allowed by our constitution . . . ." Such an instruction was sufficient to cure the error.

Defendant also cites as error the following portions of the prosecutor's closing argument:

[PROSECUTOR]: Now, during the guilt/innocence phase, the State put on evidence and the defense challenged every piece of that evidence. Every piece of it. They told you that the statement was coerced, that the agents planted in her head that Jerry Loftis was telling you something that wasn't true, that Dori Gwynn was telling you something that wasn't true.

They told you that we had even proved that Anton[e] Johnson was the shooter, and I'll argue and contend to you that they even said Anton[e] Johnson was not the shooter, and what happened? The defendant gets on the witness stand and says it's all true. It's all true. Plan A: Let's hope we can confuse them.

MR. BLITZER [DEFENSE COUNSEL]: Your Honor, can we approach, Judge?

THE COURT: All right, ladies and gentlemen, just for the record, you cannot consider that argument as it relates to some issue on the defendant's constitutional right. That cannot be considered in your determination.

MR. BLITZER: For the record, we object and move to strike that portion.

THE COURT: The motion to strike is allowed.

[PROSECUTOR]: We get to the guilt, get to the phase—now, we're at the sentencing phase. What's the defense now? The boogey-man made me do it?

Defendant contends that these statements were direct criticism of defendant's decisions to plead not guilty and to not testify at the guilt-innocence phase of trial. Although defendant notes that the trial court's instruction was immediate, defendant again argues that the instructions were vague regarding what was specifically improper.

We fail to see how the statements in issue were direct comments on defendant's rights to plead not guilty and to not testify on her own behalf. Assuming *arguendo* that the prosecutor's argument contained improper references to defendant's exercise of her constitutional rights, any possible prejudice was cured when the trial court ordered the remarks stricken from the record and instructed the jury that it "[could] not consider that argument as it relates to some issue on the defendant's constitutional right. That cannot be considered in your determination." We further note that any error would be harmless beyond a reasonable doubt because the remarks do not refer to any aggravating circumstances proffered by the State or mitigating circumstances proffered by defendant. "When the reference was made, the jury had already found defendant guilty of first-degree murder. There is no danger that the reference caused the jury to presume defendant's guilt or to regard [her] silence as indicative of guilt." *Larry*, 345 N.C. at 525, 481 S.E.2d at 923.

This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises seven additional issues that she concedes have been previously decided contrary to her position by this Court: (1) the trial court erred in using vague and overbroad language to define

the pecuniary gain aggravating circumstance at sentencing; (2) the trial court erred in denying defendant's continued objections to the prosecutor's questions staking out prospective jurors on their positions as to defendant's guilt and sentence, given that defendant did not personally shoot the victim; (3) the trial court erred in using inherently vague terms to define defendant's burden of proving mitigating circumstances; (4) the trial court erred in instructing the jury that mitigating circumstances must outweigh aggravating circumstances; (5) the trial court erred in instructing the jury such that jurors could disregard mitigating circumstances found in Issue Two when considering Issue Four; (6) the trial court erred in instructing the jury that it must be unanimous as to Issues One, Three, and Four; and (7) the murder indictment failed to include all of the elements of first-degree murder and failed to include the aggravating circumstances relied upon by the State.

We have considered defendant's contentions on these issues and find no reason to depart from our prior holdings. We therefore reject these arguments.

## PROPORTIONALITY REVIEW

[11] Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we are required to review and determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (2001).

After thoroughly examining the record, transcript, briefs, and oral arguments, we conclude the evidence supports the aggravating circumstance found by the jury. Further, we find no indication the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn then to our final statutory duty of proportionality review.

Our determination of whether the sentence of death is excessive or disproportionate requires us to "review all of the cases in the 'pool' of similar cases for comparison." *State v. Rogers*, 316 N.C. 203, 235, 341 S.E.2d 713, 732 (1986), *overruled on other grounds by Gaines*, 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver*, 321 N.C. 570,

364 S.E.2d 373 (1988). Such a review eliminates "the possibility that a person will be sentenced to die by the action of an aberrant jury." *Gregg v. Georgia*, 428 U.S. 153, 206, 49 L. Ed. 2d 859, 893 (1976); *State v. Williams*, 308 N.C. 47, 82, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983). We have previously classified "the responsibility placed upon us by N.C.G.S. § 15A-2000(d)(2) to be as serious as any responsibility placed upon an appellate court." *State v. Jackson*, 309 N.C. 26, 46, 305 S.E.2d 703, 717 (1983). In carrying out our duties under the statute, "we must be sensitive not only to the mandate of the Legislature, but also to the constitutional dimensions of our review." *State v. Rook*, 304 N.C. 201, 236, 283 S.E.2d 732, 753 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982).

With the magnitude and seriousness of our task in mind, we have carefully reviewed the facts and circumstances of this case and have compared it to the other cases in the proportionality pool. Our exhaustive comparison of the cases has led us to conclude that, while the crime committed here was a tragic killing, it "does not rise to the level of those murder cases in which we have approved the death sentence upon proportionality review." *State v. Benson*, 323 N.C. 318, 328, 372 S.E.2d 517, 522 (1988).

The jury in the present case found only one aggravating circumstance, that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). Our review of the record reveals that the evidence supporting this aggravator is weak. Testimony suggesting that life insurance proceeds were a motive for the murder came from two witnesses, both of whom gave inconsistent statements. Although a change of beneficiary or an increase in the policy amount might be expected where a murder was committed for the pecuniary gain of collecting insurance, defendant made no such changes.

The jury also found three statutory mitigating circumstances: (1) the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (2) defendant aided in the apprehension of another capital felon, N.C.G.S. § 15A-2000(f)(8); and (3) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence that any juror deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury also found three nonstatutory mitigating circumstances: (1) defendant acknowledged her guilt to a law enforcement officer, (2) defendant was a victim of physical and emotional abuse by the victim, and (3) defendant was a victim of sexual abuse as a minor.

STATE v. KEMMERLIN

[356 N.C. 446 (2002)]

We do not find any one of these factors determinative of our proportionality consideration. Rather, our emphasis is on an " 'independent consideration of the individual defendant and the nature of the crime or crimes which [she] has committed.' " *State v. Anthony*, 354 N.C. 372, 455, 555 S.E.2d 557, 608 (2001) (quoting *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *and overruled on other grounds by State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543, *by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), *and by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517)), *cert. denied*, —— U.S. ——, 153 L. Ed. 2d 791 (2002). As such, we must "consider the totality of the circumstances presented in [defendant's] case and the presence or absence of a particular factor will not necessarily be controlling." *State v. Bondurant*, 309 N.C. 674, 694 n.1, 309 S.E.2d 170, 183 n.1 (1983).

This Court has conducted an exhaustive review of the record in analyzing whether defendant's death sentence is consistent with other cases in the proportionality pool. The differences between defendant's case and other cases in the pool are too numerous to list. However, among the factors persuasive to our determination are: (1) the weak evidence supporting the pecuniary gain aggravating circumstance, (2) the evidence that defendant considered stopping the murder immediately prior to its occurrence, (3) the fact that defendant's codefendant Antone Johnson received a life sentence without parole, and (4) the jury's finding of three statutory mitigating circumstances and three nonstatutory mitigating circumstances. We therefore conclude that the totality of the circumstances do not warrant imposition of the death penalty. To be sure, any murder is a horrendous and reprehensible act; however, when compared to other cases in the proportionality pool, we cannot say that the death sentence imposed in defendant's case is proportionate.

We therefore conclude as a matter of law that the death sentence imposed in this case is disproportionate under N.C.G.S. § 15A-2000(d)(2). Upon this holding, the statute requires that this Court sentence defendant to life imprisonment in lieu of the death sentence. Because the language of the statute is mandatory, we have no discretion in determining whether a death sentence should be vacated. *Jackson*, 309 N.C. at 47, 305 S.E.2d at 718. Accordingly, the death sentence is vacated, and defendant is hereby sentenced to imprisonment in the state's prison for the remainder of her natural life, without benefit of parole. The Clerk

of Superior Court of Rockingham County shall issue a commitment accordingly.

NO ERROR IN GUILT-INNOCENCE PHASE OR SENTENCING PROCEEDING; DEATH SENTENCE DISPROPORTIONATE; DEATH SENTENCE VACATED; AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IMPOSED.